SUN OIL COMPANY, Transferee, Sunray
DX Oil Company and Subsidiaries,
Transferor

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellant.

No. 76–2388.

United States Court of Appeals,
Third Circuit.

Argued May 5, 1977.

Decided Sept. 7, 1977.

As Amended Nov. 29, 1977.

Myron C. Baum, Acting Asst. Atty. Gen., Gilbert E. Andrews, Gary R. Allen, John A. Dudeck, Jr., Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant.

Thompson, Knight, Simmons & Bullion, Buford P. Berry, J. David Anders, Emily A. Parker, Dallas, Tex., for appellee.

Before SEITZ, Chief Judge, ROSENN, Circuit Judge, and LORD, Chief Judge.*

## OPINION OF THE COURT

ROSENN, Circuit Judge.

In the quest to obtain capital, to generate business liquidity, or to minimize taxes, private enterprise often resorts to the sale of property and a simultaneous leaseback to the seller. A recurring question in transactions of this sort is whether after the transfer of title to the property some or all of the critical incidents of ownership still remain with the grantor despite his newly designated status as lessee.

This case concerns conveyances of 320 parcels of unimproved service station sites at cost by Sunray DX Oil Company ("Sunray") to a tax-exempt trust and simultaneous leasebacks to the grantor. The sole question is whether the transaction was a mere financing arrangement between the parties or an authentic sale. The Commissioner disallowed Sunray's deduction of its rental payments on the ground that the transaction did not constitute a true sale and that the rental payments were not a bona fide business expense deductible under section 162(a)(3) of the Internal Revenue Code of 1954 ("the Code").[1] In a proceeding for redetermination of the deficiency brought by Sun Oil Co., Sunray's successor in interest, the United States Tax Court held that the rental payments were deductible. The Commissioner appealed and we reverse.

### I.

During the taxable years in issue (1965–1968), Sunray, together with its subsidiaries and predecessors, was an integrated oil company engaged in all phases of the petroleum business, including marketing of petroleum and petroleum products. It was merged on October 25, 1968, into Sun Oil Company, a New Jersey corporation which was subsequently restructured as the Sun Oil Company, the appellee taxpayer herein. During the 1950's and early 1960's Sunray was actively involved in acquiring service station sites primarily in seventeen central states along interstate highways and in certain urban areas. For a variety of business reasons, Sunray concluded that the most preferable means of obtaining working capital would be to convey its service station sites and then simultaneously lease them back rather than to mortgage the properties and incur a debt obligation on its books. After deciding to pursue this course of action, Sunray ascertained that General Electric Pension Trust (the "Trust") was interested in taking title to the properties, advancing funds to Sunray equal to the cost of the properties, and then entering into lease agreements with Sunray on a long term basis together with options to purchase.[2]

---

* Joseph S. Lord, III, Chief Judge of the Eastern District of Pennsylvania, sitting by designation.

1. Section 162(a)(3) of the Internal Revenue Code of 1954 provides in part that,
   (a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—. . . (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

2. The General Electric Pension Trust is a fiduciary trust to which the General Electric Company and its affiliates contribute funds pursuant to plans of deferred compensation which meet the requirements of section 404(a) of the Code and qualify the Trust for exemption from federal income taxes. The Trust had assets of approximately two and one-half billion dollars at the time of the tax court hearing in this case.

After extensive negotiations concerning terms and conditions of the proposed sale and leasebacks, Sunray and the Trust entered into their first letter agreement, dated October 13, 1964, under the terms of which Sunray agreed to convey by general warranty deed and the Trust agreed to purchase approximately 120 service station sites. The agreed purchase price for the parcels of land, mostly unimproved, was equal to Sunray's cost[3] of acquisition and in the aggregate was not to exceed six million dollars. Simultaneous with purchase, Sunray agreed to lease the properties from the Trust for a primary term of 25 years with quarterly rentals sufficient to enable the Trust to amortize its investment in full over such initial term at an interest return of 4⅝ percent on its investment. The lease contained options exercisable by Sunray to renew the lease for two five-year terms at annual rentals equivalent to 2½ percent of the purchase price of the land and for an additional eleven five-year terms at annual rentals equivalent to 1½ percent of the purchase price.

On April 24, 1967, Sunray entered into a second letter agreement with the Trust under the terms of which the Trust agreed to purchase and Sunray agreed to sell approximately 200 additional service station sites at a price equal to Sunray's acquisition costs but not to exceed an aggregate price of eleven million dollars. Sunray again agreed to leaseback the properties for a primary term of 25 years with quarterly rentals sufficient to amortize the Trust's investment in full over such initial term at an interest return of 5⅝ percent with similar renewal options to Sunray as in the first letter; the annual rentals for the first two five-year terms were equivalent to 3 percent of the purchase price, for five additional five-year terms were equivalent to 2½ percent of the purchase price, and for six final five-year terms equaled 2 percent of the purchase price.

Sunray consummated the second letter agreement by conveying 213 separate parcels of land each by separate warranty deed. At or about the same time, Sunray leased the properties for rentals under the terms set out in the letter agreement. Sunray and the Trust executed master leases at each of the closings, the terms of such leases being essentially the same except for the effective dates, properties described, and the quarter-annual payments. The leases require that the basic rent be payable absolutely net to the Trust throughout the term *without deduction* or *setoff* and that Sunray, as lessee, pay all taxes, assessments, or similar charges assessed against the premises.

The major provisions of the leases were capsulized by the Tax Court as follows:

Each lease afforded Sunray an option to purchase any of the leased properties on specified dates, provided Sunray had discontinued or would discontinue the then business use of the property to be purchased. In each instance the price to be paid for the property was to equal its "fair appraised value * * * to Lessor." The appraisal of the property was to be conducted by three appraisers: one chosen by the lessor, one chosen by the lessee, and one chosen by the other two appraisers. The decision of any two appraisers was to be conclusive.

Sunray required that it be able to terminate its obligations to lease any property that might prove uneconomical to operate as a service station. Each lease was therefore made to provide:

During the Primary Term of this Lease, Lessee may, if Lessee intends to discontinue or has discontinued the use of the Leased Premises for its then business use, make a rejectable offer to purchase the Leased Premises as of any

No relationship whatsoever existed between Sunray and the Trust prior to the sale and leaseback transaction now under consideration.

**3.** Sunray agreed to convey the properties at cost because it believed there would be no substantial difference between the appraised

value and Sunray's actual cost of acquisition, most acquisitions having been made during the preceding 18 months. This also relieved Sunray of the necessity for expensive and time consuming appraisals.

Basic Rent payment date occurring in the Primary Term at a price in cash equal to the sum of the present values * * * of all quarterly Basic Rent payments to become due on and after the proposed purchase date * * * plus an amount sufficient to insure the Trust of a return of 5 percent per annum over the term of the investment.

Each lease further provided that if on any one of several specified dates

* * * Lessee, in the sole exercise of its business judgment, determines that the continued leasing of the Leased Premises has become unprofitable or unreasonable or unnecessary in the conduct of its business use, Lessee may make a rejectable offer to purchase * * *.

Offers to purchase made pursuant to this clause were to be identical to those offers that might have been made by Sunray had it discontinued the then business use of the property.

The Trust was given 30 days in which to consider any rejectable offer that might be made and was nowise obligated to accept such an offer. In the event such an offer were rejected, however, Sunray would be released from its obligation to lease the property which it had offered to purchase.

Each lease further provided:

In lieu of making any rejectable offer to purchase the Leased Premises permitted * * * under this Lease, Lessee shall have the right to substitute for the Leased Premises other property (to consist of land only) having a then value at lease equal to the rejectable offer to purchase consideration which otherwise would have been applicable. * * *

(Footnotes deleted.)

As of July 15, 1974, Sunray made over 130 rejectable offers to repurchase properties which it had decided would not be used for business purposes. The Trust accepted each of the offers, reconveyed the properties, and released Sunray from all obligations under the lease.

## II.

Relying heavily on *Helvering v. Lazarus & Co.*, 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939), the Commissioner contends that Sunray retained all of the benefits and burdens of ownership to the 320 service station sites it conveyed to the Trust. He maintains that the purported transfer of title and leaseback agreements were, in substance, nothing more than an elaborate financing device in which the Trust stood essentially in the position of a secured lender. The leaseback agreements, the Commissioner asserts, enabled Sunray to reflect the transactions as a footnote on its balance sheets rather than a liability, minimizing any impact on its credit rating, and, at the same time, enabled Sunray to claim a 100 percent "rental" deduction for its full cost of acquiring non-depreciable land; and that Sunray in fact retained an equity interest in the properties disqualifying the periodic payments under the leases from being deductible under section 162(a) of the Code. The Commissioner asserts that his position is supported by: (1) the "net" lease arrangement; (2) the condemnation and casualty loss provisions of the lease; (3) Sunray's absolute options to repurchase under the terms of the leases; (4) Sunray's unique right to substitute properties in the event its offers were rejected; and (5) "rental" provisions which served simply to return to the Trust the principal sum advanced with fixed interest. Sunray, however, argues that the periodic quarterly payments made pursuant to its agreements with the Trust constituted consideration for the use for business purposes of the service station sites, that the properties were sold for a fair sales price in an arm's length transaction, and that the payments were, therefore, deductible as rentals under section 162(a)(3).

The Tax Court concluded that the terms of the leases did not support the Commissioner's contention that Sunray retained an equity interest in the leased properties after the conveyances. The court believed that the purpose of the provisions for repurchase

of the leases was not "to provide Sunray with the means to reacquire the leased properties," the Trust being under no obligation to accept any offers which might be made, but to insure Sunray's ability to cancel the leases of any property which might prove uneconomical to operate as a service station site. We disagree.

### III.

A threshold problem confronting us is the standard of review. Sunray asserts that the Tax Court based its decision on findings of fact, which included a finding as to the parties' intent, and that these findings are binding upon us unless clearly erroneous. The record in the instant case, however, rests substantially on an indisputed record, consisting principally of stipulations of the underlying facts and appended exhibits, including the leases at issue. The basic rights, duties, and economic interests of the parties are essentially not in dispute. The dispute centers around the characterization for income tax purposes of the letter and lease agreements. The oral testimony offered by each of the parties was either expert testimony interpreting the documents or background testimony of some of the principals pertaining to the negotiations and their views of the transaction. In *ABKCO Industries, Inc., v. Commissioner*, 482 F.2d 150, 155 (3d Cir. 1973), we held the "interpretation and construction of a contract is a question of law and that the interpretation by the Tax Court is reviewable by this court." Of course, the subjective intent of the parties may be a consideration in interpreting an agreement where the documents are ambiguous or incomplete and, in such circumstances, the court's determination of the unexplained subjective intent is a finding of fact. When, however, the documents embodying the transaction are clear and complete, "the court is called upon to interpret the documents, and from their substance, to characterize the transaction for tax purposes as a matter of law." *Frank Lyon Co. v. United States*, 536 F.2d 746, 751 (8th Cir.), *cert. granted*, 1976, 429 U.S. 1089, 97 S.Ct. 1097, 51 L.Ed.2d 534. Regardless of whether the parties honestly believe the transaction to be a lease, where the documents they have executed fully embody the elements of their bargain it is the documents themselves, not the parties' conceptions of them, which must govern the legal characterization of the transaction. *See Oesterreich v. Commissioner*, 226 F.2d 798, 801–02 (9th Cir. 1955). We view the question here as essentially legal, not factual, and fully reviewable by this court. *Helvering v. Lazarus & Co., supra; American Realty Trust v. United States*, 498 F.2d 1194, 1198 (4th Cir. 1974).

### IV.

In the usual mortgage transaction between a debtor and creditor, the funds advanced to the debtor are secured by a lien on his property. The debtor agrees to repay the funds over a fixed term together with specified interest for their use; generally, the ownership of property does not change hands. The usual business bargain between a commercial lessor and lessee is far more complex. Real estate interests between a lessor and lessee normally are divided into a number of parts, each of which represents an ownership interest in property. In order to sort out these interests, the following pragmatic approach has recently been suggested:

> If the characterization for federal income tax law purposes of the interests of a lessor and a lessee is to be determined in a manner consistent with business realities, the inquiry must change from "Who is the owner of the property for tax purposes?" to "Are the ownership interests of lessor and lessee as characterized by the parties consistent with traditional substantive business bargains between lessors and lessees?"

Rosenberg & Weinstein, *Sale-Leasebacks: An Analysis of These Transactions After The Lyon Decision*, 45 J. of Tax, 146, 148 (1976).

In the instant case, the actual conveyance to the Trust of title to the properties and the fair market value of the prices assigned to them does not appear to be an

issue. Although Sunray argues that the presence of fair market value as a consideration for the transfer distinguishes the instant case from *Helvering v. Lazarus & Co., supra* ; and *Leeds & Lippincott Co. v. United States*, 276 F.2d 927 (3d Cir. 1960), we doubt that this is a controlling consideration. We deem much more significant the relationships of the parties after the transfer of the properties as a result of the burdens, benefits, and risks imposed on each of them by the terms and conditions of their lease agreements. In determining whether the sale-leaseback transactions in the instant case created the traditionally bargained for business relationships between owner and lessee or whether Sunray in fact retained an equity in the real estate despite the conveyances, we look to the economic realities of the leases and not to the labels applied by the parties.

In *Lazarus, supra*, the taxpayer claimed depreciation on three buildings in which it operated a department store, the legal title to two of which and the assignment of a 99 year lease to the third it had transferred to a bank as trustee for certain land trust-certificate holders. The trustee had at the same time leased all three back to the taxpayer for 99 years with options to renew and purchase. The taxpayer claimed depreciation as a deduction because it bore the capital loss from wear, tear, and exhaustion of the buildings. The Commissioner disallowed the deduction on the ground that the statutory right to depreciation follows legal title. The Court of Tax Appeals, however, allowed the deduction, concluding that the transaction between the taxpayer and the trustee bank was in reality a mortgage loan; that the conveyance of title to the bank was actually given merely as security for a loan and that the "rent" stipulated in the leaseback was intended as a promise to pay an agreed 5 percent interest on the loan. The circuit and Supreme Courts affirmed, the Supreme Court noting that in the field of taxation the courts are "concerned with substance and realities, and formal written documents are not rigidly binding."

*Lazarus, supra*, 308 U.S. at 255, 60 S.Ct. at 210.

## A. THE RISKS AND RESPONSIBILITIES

As in *Lazarus*, the lease arrangements between the parties in the case *sub judice* provide that the lessee, Sunray, pay all taxes and assume the full burden and cost of keeping the premises in good condition. The Trust is relieved of the responsibility to repair, rebuild, or renew any buildings, structures, or improvements "or to make any expenditures whatsoever in connection with this lease . . . ." Moreover, Sunray has agreed to indemnify the Trust and hold it harmless from any and all liabilities arising from the use and occupancy of the premises, including liability for any causes of action, judgments or violations of laws or regulations affecting the premises. Sunray has also obligated itself to pay rent absolutely net throughout the term without deduction or setoff under any circumstances. Diminution of rental even because of casualty or condemnation is not permitted. Thus, it is apparent that the leases impose essentially all burdens, risks, and responsibilities for the properties upon the lessee. Thrusting all of such burdens and risks on the lessee under every condition and circumstance and none on the lessor is hardly consistent with customary substantive bargains in the market place between lessors and lessees.

## B. THE BENEFITS OF THE TRANSACTION

### 1. Rejectable offers upon condemnation or seizure by eminent domain.

In addition to assuming the risks and burdens incident to the ownership of property, Sunray also controls certain important benefits which traditionally are reserved to the owner in the event leased premises are condemned or seized by eminent domain. During the primary term, if all or any part of the leased premises becomes "in the sole and absolute judgment of lessee" undesirable for the lessee's business or for any use then existing, because of a taking by con-

demnation or eminent domain, the lessee has the right to make a "rejectable offer" to purchase the property. The Trust has thirty days after receipt of the written offer to accept or reject it and failure to act within the prescribed period constitutes an acceptance. Significantly, the lessee not only has the unilateral right to determine whether the taking is sufficient to make the premises "undesirable" for its further use, but the repurchase price fixed for the offer is equal to the sum of all present values[4] of the quarterly payments to become due after the proposed date of repurchase, plus a pre-determined premium.[5] If Sunray's offer to repurchase during the primary term is rejected by the Trust, then the condemnation award is payable both to Sunray and the Trust as "their interests may appear" at the time of the taking. During the extended term of the leases, Sunray also has the absolute right to share in any condemnation award as "their interest may appear." Significantly, if a portion of the premises is taken by condemnation or eminent domain but the lessee elects to occupy the balance, there is *no abatement of rent* and the entire award for the taking belongs to the lessee. The lessee is also irrevocably empowered to negotiate the terms and price for any taking and to sell and convey the properties without the prior approval or joinder of the Trust. We view the retention of such broad powers by the lessee in the event of condemnation or government seizure of the land, especially the power to negotiate the price for the land, and the absence of rent abatement in the event of a partial taking and continued occupancy of the balance as inconsistent with the traditional role of a lessee.

### 2. Rejectable offers upon discontinuance of use.

Sunray also enjoys the unique right when, "in the sole exercise of its business judgment," it decides that the use of a parcel of land is no longer profitable or necessary in conducting its business to make a rejectable offer to purchase it.[6] Again, the price is not dependent upon the fair market value of the land at the time but is fixed in an amount equal to the sum of the present values of all quarterly basic rent payments to become due in the future plus the applicable prepayment premium shown in Schedule "C" attached to the leases.

### 3. Lessee's rights of substitution.

Sunray also had the extraordinary and absolute right, in lieu of making any rejectable offer or upon rejection of such an offer, to substitute other land having at least equal value for the leased premises. The value of the land to be substituted "[was to] be determined by the lessee's book value therefor." This unilateral right of substitution thus enabled Sunray to reacquire legal title to any parcel of land whenever it made a rejectable offer.[7]

### 4. Analysis of rejectable offer provisions.

We believe that the substance and reality of the "rejectable offer" provisions, particularly the rights of substitution, enabled Sunray during the taxable years in issue to

---

4. Under the leases executed pursuant to the firm letter agreement, the present value of a rent payment is to be determined by discounting it on the basis of an annual interest rate of $4\frac{5}{8}$ percent from the date on which it is payable to the date on which the present value is to be determined.

5. The lessee can be relieved of the premium by certifying that it will discontinue the use of the leased premises for any income producing activity.

6. R. Paul Henry, former senior vice-president for Finance and Planning for Sunray, testified that "we put [this provision] in there in the

event the tax law changed and the tax consequences of this deal changed for either party, it permitted the deal to be unwound. But, I know we had some discussion of possible changes in tax law and it was decided it would not be wise to identify that as an occasion for rejectable offer and I think this language [in the leases] was adopted to substitute for that."

7. Sunray's right to substitute other parcels in the event the Trust rejected a rejectable offer was rescinded by the parties 8 years later, after the commencement of an audit by the Commissioner.

retain ultimate control over the leased properties subject to repayment with interest of the advances made by the Trust. We cannot accept the Tax Court's conclusion that the rejectable offer provisions do not vest any equity interest in the lessee because "the trust was under no obligation to accept such offers as might be made." The Tax Court, failed to analyze the lessee's rights of substitution, dismissing them with the observation that they were never exercised and were ultimately rescinded on August 9, 1972; we believe these rights of substitution rendered illusory the lessor's rights to reject an offer.

The limitations of time, distance, and subject matter also erode whatever substance may have existed in the lessor's rights to reject an offer. The Trust had only thirty days after the receipt of rejectable offers to reject them and the failure to act was deemed to be an acceptance. The offers left the Trust with virtually an impossible task of securing independent appraisals on comparative low unit value properties, securing competent advice, and reaching an intelligent, considered decision within a short time on multiple pieces of diverse properties geographically dispersed over many states. In fact, the Trust initially objected to the thirty-day limitation but ultimately accepted it and agreed to waive an appraisal requirement. Rejecting the offer would have required the Trust, having no employees with background or experience in real estate management, to undertake the heavy burden of managing small real estate parcels and properties scattered over 17 states. The acceptance of such a burden was viewed by trust officials as being inconsistent with the investment goals of this 2½ billion dollar trust. Furthermore, since Sunray had to certify that the property would no longer be used for its then existing business purposes, the only time the parcels would be repurchased as a practical matter would be for resale. The extreme impracticality of rejecting a rejectable offer is evidenced by the Trust's

acceptance of all 136 of Sunray's "rejectable" offers made during the first few years of the leases. The Trust never took possession of any property described in a rejectable offer.

Thus, Sunray, even though it was the titular lessee of the properties, had the exclusive means of realizing the benefits in appreciation in the market value of the properties by making a rejectable offer which had little likelihood of being rejected; if perchance it were rejected, Sunray had the absolute right to substitute other parcels of property. In addition, as we later discuss, Sunray had also the absolute option to repurchase the properties during the extended terms of the leases for an option price equal to the fair appraised value of the leased premises to the lessor.

In our view, the powers vested in the lessee in the event of condemnation or seizure of property pursuant to the power of eminent domain, including the right to negotiate the sale or settlement price, the right to make rejectable offers, and the extraordinary rights of substitution are significant benefits characteristic of the ownership of property rather than that of a leasehold.

## C. THE RENTALS

Rentals in these transactions were apparently geared to return the Trust's advances plus interest. To achieve such a result, the rentals for the primary term were set at a predetermined figure. According to R. Paul Henry, who negotiated these transactions for Sunray, the rental value was fixed by formula based on a twenty-five year period to enable the Trust to recover the amount of money advanced for the properties plus "a reasonable agreed amount for what would be comparable to interest. And then, should the leases be terminated prior to the end of the twenty-five year primary term, an added amount would be paid to G.E. [the Trust] because this was a rather awkward type transaction." [8]

8. Mr. Henry acknowledged that in this instance the premium was "the factor applied to bring the effective rate up to either 5 percent or 5¾ percent in the event of premature termination

Additional evidence in the record indicates that the rentals do not reflect the market value of the properties. We think it significant that the Trust determined the fair rental value for the properties by merely treating the transaction as an "investment alternative," rather than applying the capitalization of earnings method as an accepted appraisal method. Mr. Pope, the Commissioner's expert, prepared a valuation report for the properties which is in the record. It reveals that the rentals fixed for the primary term are quite high.[9] A fair rental value for a non-wasting asset such as unimproved land to a lessee with Sunray's high credit standing would be the cost of money times the investment. Mr. Pope's valuation report reveals that in October 1964, Government bonds were yielding 4.15 percent, triple A utility bonds were paying 4⅜ percent, and top grade corporate bonds were paying 4.52 percent. Effective mortgage rates ranged from 5.5 percent to 6.1 percent, depending upon the lending institution. Although the annual rate of return due under the transactions with the Trust was 6.79 percent, Mr. Pope revealed that a reasonable rate of return would have been 4⅝ percent, the interest rate specified in the lease agreement, without the amortization of the cost of the land. The amortization of unimproved land as part of the rental, represented by the difference of 2.144 percent, is not a common practice in the marketplace. In short, the rentals were mathematically geared to amortize the moneys advanced by the Trust at the agreed annual rate of 4⅝ percent over the primary 25 year term of the lease or through the exercise of Sunray's repurchase rights; they bear little resemblance to the true economic value of the properties.

Also supporting the Commissioner's contention that the rentals do not reflect market value but were merely based on a formula which included the current interest rate plus an amortization factor is the underlying "Schedule of Direct Reduction Loan" attached to the leases which sets forth in typical loan arrangement form the interest rate, the amount of the principal loan, the term of years, the payment number and the apportionment of the quarterly payments between principal and interest. This schedule of payments is identical to the procedures utilized in conventional direct reduction mortgage loans which became popular in this country during the "Great Depression" of the 1930's. Likewise, in their negotiations, the parties frequently referred to the payment of interest and principal, to "standby fees" and loan "commitment fees," terms common in mortgage financing and not in the traditional relationships between lessor and lessee.[10]

In the letter dated September 21, 1974, to Eastman Dillon, Sunray's counsel also points out that in the twenty-sixth year of the proposed lease, "the unencumbered appraised value would probably exceed the original investment if present inflationary trends continue." Notwithstanding his conception of the increased value in the land and his prophetic view of inflationary trends, the rentals payable in the twenty-sixth year and thereafter during the next sixty-four years of the thirteen extended terms do not increase but are sharply reduced. The quarter annual rents drop from $1015.38 to $375.00 for the first two extended terms and then drop again to $225.00 for the next eleven extended terms. Thus,

of the leases," and that prepayment penalties arise in mortgage transactions, debenture financing, or private placement loans.

9. The Tax Court in the instant case did not make any findings of fact or conclusions of law regarding the reasonableness of the rent payable by Sunray during either the primary or extended terms of the lease. Compare *Leslie Co. v. Commissioner*, 539 F.2d 943 (3d Cir. 1976), in which we relied on the Tax Court's findings as to the fair rental value of the leasehold.

10. In his lengthy letter dated September 21, 1964, to Eastman Dillon, chief counsel for Sunray understood the essence of the transaction as a loan. He wrote: "A money lender who is being offered at least a return of the principal together with 5 percent interest thereon should have no reason to insist on an appraisal." Another paragraph of the same letter refers to the unacceptability of the Trust's proposal because of its adverse effects on "the *economics* of the *financing*." (Emphasis supplied.)

Sunray having paid for the properties in full during the primary term, was entitled to remain in possession for the next sixty-five years at nominal rents. If it exercised all of its options for each of the extended terms, the additional cost therefor, as the Tax Court recognized,[11] was merely to increase the Trust's return from 4⅝ percent per annum to 5½ percent. It is hardly conceivable that an owner of real estate—especially a large sophisticated trust—concerned with a fair rental on its land rather than a return of its loan and interest, would enter into a lease with sharply declining rentals for sixty-five years following the conclusion of the primary term on December 31, 1989. The extended term features of the lease further indicate to us that the Trust, as a lender, was only looking to a return at a fixed rate on its advances, and not to a reasonable return on the fair market value of property which it held as owner.

### D. THE OPTIONS TO REPURCHASE

The repurchase provisions of a sale and leaseback agreement serve the same function as a mortgage loan when the repurchase price is geared to the unamortized principal advanced by the purchaser-lessor. *See Frank Lyon Co., supra,* 536 F.2d at 752–54. In the instant case, in addition to Sunray's right to make rejectable offers to repurchase the parcels in certain situations by, in effect, paying off the unpaid principal balance of the Trust's advance plus the applicable schedule "C" premium payment, Sunray has the absolute right to purchase leased parcels under section 9 of the leases during the first year of each of the thirteen extended terms. This right is subject to the same conditions stipulated in connection with the rejectable offers (1) that Sunray must discontinue the use of the premises "for its then business use" and (2) that the repurchase price be equal to the "fair appraised value of the leased premises to Lessor" as fixed by three appraisers. These provisions give Sunray considerable flexibility despite the requirement that it must discontinue "its then business use" of the property. Since most of the sites were unimproved non-income properties at the time of the lease arrangements, Sunray could improve the properties and resell them to investors whenever it deemed conditions appropriate in the future, as it previously had done on other occasions with similar properties, and such a sale would work a change in the "then business use." Furthermore, nothing prevented Sunray from diversifying its operations and using the land for other income producing purposes.

The Commissioner contends that the appraisal procedure prescribed for these non-rejectable options gives Sunray another avenue by which to enjoy appreciation and the "equity" built up through its "rental" payments. The contract provides that upon exercise of the option, the lessor and lessee will each appoint an appraiser and the two appraisers thus chosen will select a third. The appraisers are required by majority decision to fix "the fair appraisal value of the leased premises to the Lessor" and the appraisal fees and expenses are to be paid solely by the lessee. The Tax Court disagreed with the Commissioner's analysis of this provision, reasoning:

> Respondent [Commissioner] maintains that the price established by this formula would be the appraised value of the property as encumbered by the Sunray leases—an amount equated by respondent with the present value of future rentals. Thus understood, the provision establishing the option price would preclude the Trust from enjoying appreciation in the value of the property subsequent to the conveyance by Sunray. In our opinion, however, the formula, based as it is upon an appraisal of the property, would secure to the Trust the benefit of such appreciation.

We believe the Tax Court misconstrued the provisions when it read them as requir-

---

11. The Tax Court stated that "[i]f Sunray were to exercise all the options to renew, the Trust would realize a return of approximately 5½ percent per annum on its investment over the terms of the lease as extended."

ing the lessee to pay the fair market value for the property upon the exercise of the options. In the absence of a provision to the contrary, the appraisers had to consider all legal obligations encumbering the property in appraising its value and had to recognize the present value of any reversion in the land at the termination of the encumbrance. *Plaza Hotel Ass'n v. Wellington Ass'n*, 55 Misc.2d 483, 285 N.Y.S.2d 941 (Sup.Ct.), *aff'd*, 28 A.D.2d 1209, 285 N.Y. S.2d 267 (1967), *aff'd*, 22 N.Y.2d 846, 293 N.Y.S.2d 108, 239 N.E.2d 736 (1968). Counsel for Sunray recognized that the leases encumbered the properties and adversely affected their appraisal after the primary term.[12] Thus, in assessing the "fair appraised value . . . to Lessor," the appraisers would have to consider the encumbrances of the properties with leases of very low rentals, thereby seriously reducing the present value of future rentals.

The Commissioner also contends that since the option price was equal to the present value of future rents payable under the lease the appraisers must recognize that the reversionary value of the property in the year 2055 is de minimis because of the high discount factor applicable to a sum due sixty-five years in the future. If the fair market value had doubled or quadrupled, Sunray would be able to acquire the property for a fraction of its original cost.[13] Sunray argues, on the other hand, that the lease agreements are not totally clear, and that the Commissioner's interpretation conflicts with the language of the lease, with the interpretation of his own expert, and with that of the trustees of the Trust. Sunray asserts that the Tax Court appropriately found that the option price was not merely equivalent to the present value of future rents but that it would secure to the

Trust, upon appraisal, the benefit of any appreciation in value of the properties.

Our review of this holding by the Tax Court is not limited to the clearly erroneous rule, as Sunray argues, since the interpretation of the option provisions is a question of law. We disagree with the Tax Court's view of these provisions of the leases for the reasons previously expressed and hold that the "then appraised value" to the lessor is essentially equivalent to the present value of the future rents under the lease. Thus, the options to repurchase provide Sunray with a built in latch-string by which it could spring legal title to the properties whenever it served its convenience without obligating Sunray to pay the fair market value. Sunray could thereby acquire the benefits of appreciation in the property by merely paying the present value of future rents payable under the lease.

Finally, Sunray contends that the Trust may, without notice to or consent of Sunray, assign or transfer to any party, for any purpose, at any time its rights under the lease, even for purposes of refinancing. It argues that the Trust's ability to refinance its investment is a significant attribute of real estate ownership. This may be true as a general principle. In the instant case, however, the right to assign or refinance may be hollow since it is subject to the extraordinary low rentals during the lengthy extended terms of the leases. Furthermore, any significance attached to the right to refinance is eroded in the instant case by other significant attributes of ownership retained by the lessee.

## V.

In conclusion, we recognize that sale-leaseback arrangements play a useful and

**12.** This view is reflected in his letter of September 21, 1964, to Eastman Dillon wherein he writes: "Since, as of the time of the exercise of the option, the land is still burdened with the Lease, the repurchase price is essentially the then present value of future rents under the Lease. . . . Because of the low extended term lease rents (2.5% per annum. of the original investment for 10 years, and 1.5% per annum for the remaining 55 years) the unencum-

bered appraised value would almost certainly be higher than the encumbered appraised value."

**13.** Mr. Pope illustrated this point with the following example. Assuming a property cost $60,000 at the outset of the sale in 1965 and it had a market value of $100,000 in 1990. Given a 6 percent factor, Sunray could repurchase the property for about $21,000.

accepted role in our economy. We also note that some of the provisions of the leases in the instant case when viewed independently do not brand the transaction as a financing arrangement. A number of other important features, however, "have been employed in the same transaction with the cumulative effect of depriving [the lessor] of any significant ownership interest." *Frank Lyon Company v. United States, supra,* 536 F.2d at 754.

As the lessee, Sunray bore the burdens, risks, and responsibilities for the properties, including the obligation to provide the Trust with a fixed guaranteed return under all circumstances and conditions. The lessee also controlled important benefits traditionally reserved to the owner of property: the lessee had the right to negotiate the settlement or accept the condemnation award and receive the payment; in the event of total or partial condemnation the lessee retained the right to terminate the lease whenever in its sole judgment a parcel of land was no longer profitable or necessary in its business and to make a "rejectable offer" which for all practical purposes was unrejectable; the lessee, in any event, enjoyed the right to substitute other land if perchance an offer was rejected or in substitution of a rejectable offer. These risks, burdens, and benefits are strong attributes of ownership, not of a leasehold interest.

The leases also bear marked similarities to debt financing, particularly to direct reductions loans, including the structural and guaranteed interest rate, consistent with the going market interest rate for quality firms of Sunray's credit standing, the prepayment penalties, the schedule of payments, and the rejectable offer procedures. The rents have no visible connection with the economic value of the property but are evidently related to a fixed interest return on the advances. Finally, the options to acquire the property at the end of the primary term at the value to the lessor is a form of "equity" because the value to lessor is really the present value of future payments for sixty-five years at a specified rate.

We therefore conclude that the sale-leaseback transactions were a financing arrangement. Sunray's claim under section 162(a)(3) for rental payments made pursuant to the leases will accordingly be disallowed.

The decision of the Tax Court will be reversed and the case remanded for the entry of an appropriate decision not inconsistent with this opinion.