WILLIAM N. AND POLLY A. WEST, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
West v. Commissioner
Docket No. 29826-81.
United States Tax Court
T.C. Memo 1984-421; 1984 Tax Ct. Memo LEXIS 254; 48 T.C.M. (CCH) 796; T.C.M. (RIA) 84421; August 7, 1984. Stephen L. Kadish and J. Timothy Bender, for the petitioners. George T. Bell, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION
*255 HAMBLEN, Judge: Respondent determined deficiencies in petitioners' 1974 and 1975 Federal income taxes in the amounts of $59,375.00 and $24,197.00, respectively. After concessions, the issues for decision are: (1) whether petitioners are entitled to deductions under sections 163(a), [1] 167(a), and 162(a)(1) stemming from a purported sale-leaseback; (2) alternatively, whether a $70,000.00 payment made by petitioners is deductible in 1974 under section 162(a)(1); (3) whether respondent timely raised the issue of the $70,000.00 payment; and (4) whether the burden of proof as to the deductibility of the payment is upon the respondent. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners William and Polly West [2] resided in Willoughby, Ohio, when they filed their petition in this case. *256 During the taxable years in issue, petitioner was employed as an executive by Ostendorf-Morris Company, a real estate management and development company and commercial real estate broker. Petitioner began investing in real estate for himself in 1970, and had interests in 25 to 30 real estate projects. Petitioner and Walter McClennan ("McClennan"), became friends in 1966. Prior to 1974, petitioner and McClennan entered into one real estate venture together. In 1971, McClennan began to develop Stepnorth, a specialty shopping mall in Chagrin Falls, Ohio. McClennan's basis in the land was approximately $50,000.00, and his construction costs for the mall were between $1,250,000.00 and $1,500,000.00. McClennan secured nonrecourse financing for the mall totalling $1,125,000.00 from Cuyahoga Savings Association ("Cuyahoga"). Faced with cost overruns, delays in construction, the unavailability of further loans, rental problems, and his inexperience in development, McClennan ran into financial difficulty and, in 1974, he fell behind on his mortgage payments to Cuyahoga. McClennan and petitioner discussed the possibility of petitioner's financial involvement with Stepnorth in August *257 1974. On August 20, 1974, petitioner loaned McClennan $30,000.00 to prevent a default on the mortgage. McClennan gave petitioner a promissory note for this loan. McClennan viewed the loan as an indication of petitioner's good faith and interest in purchasing Stepnorth. Petitioner desired to purchase Stepnorth outright from McClennan. McClennan insisted upon an option to repurchase and a lease. He wanted the opportunity to reverse his financial position, reacquire the mall, and preserve his reputation in Chagrin Falls. Petitioner agreed to McClennan's terms with the expectation that McClennan would either default or be unable to exercise the option. No formal appraisal of the value of Stepnorth was obtained at any time during the sale and leaseback. In October 1974, petitioner entered into an agreement with McClennan, pursuant to which petitioner purchased Stepnorth, leased the mall back to McClennan, and gave McClennan an option to repurchase at a fixed price. In the agreement, the sale price for the mall was $1,175,000.00, which consisted of a $50,000.00 downpayment and petitioner's agreement to make payments on the $1,125,000.00 mortgage held by Cuyahoga. Petitioner's *258 downpayment consisted of a promissory note in the amount of $30,000.00, due December 31, 1974, and a promissory note in the amount of $20,000.00, due June 1, 1975. The $30,000.00 note was paid on January 31, 1975. The $20,000.00 note was not paid and was cancelled when McClennan exercised his option to repurchase. Under the agreement, McClennan leased back the property for eight years on a net-net basis, which provided that McClennan was to continue to pay any deficits and entitled him to retain any positive cash flow remaining after expenses. Petitioner received $9,750.00 monthly rent, and his only obligation was to make mortgage payments to Cuyahoga of $9,500.00 per month. Cuyahoga consented to the substitution of petitioner on the mortgage. McClennan was responsible for all insurance, taxes, and rentals at Stepnorth. Petitioner was named on Stepnorth's insurance policy as the recipient of any fire and casualty insurance proceeds. Since petitioner did not purchase the underlying land, he entered into a ground lease agreement with McClennan for ten and one-half years, at a quarterly rent of $937.50. Petitioner never made these payments, since under the leaseback McClennan *259 assumed all of petitioner's interests and obligations in the mall. Neither the leaseback nor the ground lease agreement provided petitioner with an option to renew the initial ground lease or to buy the underlying land. Petitioner became aware of this in 1975, when McClennan mortgaged the land for additional funds. McClennan then provided petitioner with an option to purchase the land underlying Stepnorth. Pursuant to the agreement, petitioner paid McClennan $70,000.00, designated as a "one time rent-up and management fee for past, present and future services." In partial payment of this amount, petitioner on October 3, 1974 cancelled the promissory note for $30,000.00 that he received from McClennan in August 1974. Petitioner paid McClennan $40,000.00 in October 1974, after the execution of the agreement. The $70,000.00 was nonrefundable to petitioner, whether or not McClennan managed the mall for the full eight-year term. The minimum "fee" McClennan would have charged, if the agreement did not include the repurchase option, was $134,400.00. Additionally, the agreement provided McClennan with an option to repurchase Stepnorth at any time prior to October 1, 1982, for $1,245,000.00. *260 Petitioner agreed to grant the option if he could recoup all his cash outlays through the repurchase price. Under the terms of the agreement, petitioner was not permitted to record his title to the mall unless McClennan defaulted or the leaseback expired without exercise of the option to repurchase. The title was held in escrow. McClennan was eager to preserve the appearance of continued ownership to save face in Chagrin Falls. At the time McClennan entered into the agreement with petitioner, he intended to do everything in his power to repurchase Stepnorth and to successfully run the mall in the intermim. McClennan exercised the option to repurchase Stepnorth in October 1976 at the stipulated price of $1,245,000.00, which consisted of a cash payment of $119,209.00 plus the cancellation of petitioner's unpaid $20,000.00 note, due June 1975, consisting of $20,000.00 principal and accrued interest of $1,673.00. McClennan also assumed payment of the mortgage to Cuyahoga, which was then in the amount of $1,104,818.00. [3] In 1975, McClennan married the daughter of a wealthy family, and his father-in-law lent him the money for the repurchase of Stepnorth. *261 Petitioners deducted the interest paid to Cuyahoga and depreciation on Stepnorth on their 1974 and 1975 returns, and deducted the $70,000.00 fee payment as a business expense on the 1974 return. Respondent disallowed all of these deductions, asserting that the sale-leaseback was in actuality a financing transaction. Alternatively, respondent asserted at trial that the $70,000.00 fee payment was part of the purchase price and therefore is part of petitioner's basis for depreciation, rather than a deductible business expense. OPINION Sections 163(a), 167(a), and 162(a)(1), respectively, allow deductions for interest expenses, depreciation, and ordinary and necessary business expenses. For the lessor to be entitled to these deductions, the sale-leaseback transaction must be in substance more than a financing arrangement. It is the substance, rather than the form in which the parties have cast a transaction, that determines its character. Gregory v. Helvering,293 U.S. 465 (1935). The focus is the practical effect of the transaction, not its technical effect. Northwest Acceptance Corp. v. Commissioner,58 T.C. 836 (1972), affd. per curiam, *262 500 F.2d 1222 (9th Cir. 1974). The courts have focused on varying factors in determining the substance of a particular transaction. One factor examined is the parties' intent, determined from the facts and circumstances existing at the time of the transaction, including economic realities. Oesterreich v. Commissioner,226 F.2d 798 (9th Cir. 1955); Northwest Acceptance Corp. v. Commissioner,supra.Other opinions viewed a transaction in terms of whether the economic realities indicate that the relationship of lessor-lessee was created. Sun Oil Co. v. Commissioner,562 F.2d 258 (3d Cir. 1977). In Helvering v. F. & R. Lazarus & Co.,308 U.S. 252 (1939), the taxpayer sold legal title to its buildings to a bank, which simultaneously leased the properties back to the taxpayer for 99 years, with options to renew the lease. The taxpayer claimed depreciation deductions, which were disallowed by respondent, taking the position that the right to depreciate followed legal title. The Supreme Court held that the transaction between the bank and the taxpayer was, in substance, a mortgage loan, and the *263 taxpayer was entitled to the depreciation deduction. The Court regarded the "depreciation fund" required by the lease as an amortization fund designed to pay off the loan. More recently, in Frank Lyon Co. v. United States,435 U.S. 561 (1978), the Supreme Court upheld the form of a sale-leaseback using a factual analysis. The Court stated in Lyon,supra at 583-584: In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes. What those attributes are in any particular case will necessarily depend upon its facts. * * * In Lyon, the Worthern Bank & Trust Co. ("Worthern") planned to construct an office building. *264 Under state and federal regulations, Worthern was prevented from financing the building through conventional mortgage loans. The bank regulatory authorities approved Worthern's sale-leaseback transaction, provided title was held by an independent third party and Worthern retained an option to repurchase. After obtaining a commitment for permanent financing, Worthern negotiated with several interested parties and selected Frank Lyon Co. to be the buyer-lessor. Frank Lyon was a member of Worthern's board. Thereafter, Worthern and Lyon executed interlocking agreements, wherein Worthern leased the underlying land to Lyon for 76 years, sold the building to Lyon, and leased it back for a 25-year term with options to renew. The purchase price of the building totalled $7,640,000.00, which was financed in part by a third party loan of $7,140,000.00, which was secured by a mortgage on the building, and upon which Lyon assumed personal responsibility. The remaining $500,000.00 was paid in cash with Lyon's own funds. Worthern had options to repurchase the building at periodic intervals for the amount of the outstanding mortgage plus Lyon's original $500,000.00 investment, with six percent *265 compounded interest. The lease to Worthern was a net-net lease, and Lyon's only financial obligations were the mortgage payments. Worthern's rental payments exactly equalled the mortgage payments. Respondent disallowed Lyon's claimed interest expense and depreciation deductions, arguing that Lyon was not the building owner for tax purposes. The Supreme Court sustained the form of the transaction, distinguishing Lazarus based on the presence of the third party. The Court noted that even though Worthern's rent equalled the mortgage payments, if anything went awry with the lease, Lyon was the party liable on the mortgage. The Court pointed to the arm's-length nature of the negotiations despite Frank Lyon's presence on Worthern's board, and stressed the economic reasons for entering into the transaction. In Hilton v. Commissioner,74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982), cert denied, 459 U.S. 907 (1982), we held a sale-leaseback transaction lacked substance, applying the general principles of Lyon to test the transaction. Lyon was distinguished since, in Hilton, rent failed to cover the mortgage payments, *266 no funds were paid to the seller-lessee, the buyer-lessors could not dispose of the property at a profit, and the transaction was packaged and marketed as a tax shelter. Considering other facts in the case, we held that: [W]e do not deem the existence of a net lease, a nonrecourse mortgage or rent during the initial lease term geared to the cost of interest and mortgage amortization to be, in and of themselves, much more than neutral commercial realities. * * * [Hilton v. Commissioner,supra at 348.] See also Dunlap v. Commissioner,74 T.C. 1377, 1436 (1980). In the instant case, respondent urges us to distinguishe Lyon and find that the transaction in issue was in substance a financing agreement rather than a sale-leaseback. We disagree and hold for petitioner on this issue. Applying the tests in Lyon, respondent first argues that, although it appears that the sale-leaseback in issue is a three-party transaction between petitioner, McClennan, and Cuyahoga, the transaction, in substance, was between petitioner and McClennan. Respondent notes the nonrecourse nature of the mortgage and the fact that McClennan negotiated *267 the loan from Cuyahoga several years prior to petitioner's involvement. The use of nonrecourse financing is a neutral factor. See Hilton v. Commissioner,supra at 363; Dunlap v. Commissioner,supra at 1435. Moreover, it is clear that Cuyahoga approved the substitution of petitioner on the mortgage. We find McClennan's prior negotiation of a loan to develop property himself to be another commercial reality. Respondent points to the secrecy requirement in the deal and to the fact that the deed was kept in escrow and not registered as further proof that this was a loan between two friends. McClennan, however, testified convincingly of his desire to save face in Chagrin Falls and to avoid the costs of a transfer. Further, Cuyahoga was aware of the transfer, and looked to petitioner for payments on the mortgage. Second, respondent attacks the economic substance of the transaction. McClennan's rental payments covered the mortgage payments and gave petitioner cash flow of about $3,000.00 per year. A lease structured in this manner was approved in Lyon, and approved by this Court in Dunlap v. Commissioner,supra. *268 Contrary to respondent's argument, we do not attach significance to petitioner's failure to pay ground rent. Under the net-net lease, McClennan assumed responsibility for this payment. Therefore, he was required, in effect, to make these payments to himself. As noted in Hilton v. Commissioner,supra, net-net leases are a commercial reality. Respondent argues that the sale and repurchase price were unreasonable, noting that no formal appraisal of Stepnorth was obtained. We disagree. Petitioner was an executive at a large real estate firm, and an experienced investor in his own right. He believed that he acquired Stepnorth at a bargain price, and we accept his assessment. Based on the costs of construction and the potential for appreciation, it is clear that the purchase price was not inflated, and since the rent more than covered the mortgage payments, petitioner had no incentive to "walk away" from the deal. See Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Hilton v. Commissioner, supra.Petitioner had no "put" to force the repurchase.[4] The deal was structured *269 so that petitioner recouped all cash outlays, including the $70,000.00 fee through the repurchase price. Not only was this type of repurchase found in Lyon, but petitioner would also profit on the exercise of the option through prior amortization of the mortgage. See Dunlap v. Commissioner,supra.Thus, we find the transaction to have economic substance. Third, respondent argues that there were no business realities in the transaction, contending there were no real arm's-length negotiations and that there was no intent for McClennan to ever relinquish the mall to petitioner.The assertions are directly contradicted by the evidence. In Lyon, regulatory requirements forced Worthern to fashion a sale-leaseback. In the instant case, financial circumstances forced McClennan to find a buyer for Stepnorth. Each party had different goals and sought the best deal possible to further his separate aims. McClennan wanted an option to repurchase and secrecy. Petitioner wanted a good price and protection of his cash outlays if repurchase occurred. The $30,000.00 loan was made as a *270 part of the negotiation process, to prevent foreclosure by Cuyahoga prior to the sale. We find that even though the parties were friends, they negotiated at arm's length. Additionally, it is clear that at the time of the sale both petitioner and McClennan viewed an exercise of the repurchase option as unlikely. Despite their friendship, petitioner hoped McClennan would either default or fail to exercise the option, leaving petitioner with clear title to the mall. Respondent appears to argue that, because McClennan did exercise the option in 1976, it was never intended for actual ownership to pass to petitioner. Though title was not recorded, petitioner was known by Cuyahoga to be the owner, and he would receive any insurance proceeds on the property. We do not believe that McClennan's hopes to reacquire Stepnorth, and his plans to do anything in his power towards that end, constituted a fixed agreement between the parties that he indeed would exercise his option. Only his marriage enabled McClennan to raise the money to repurchase Stepnorth. Finally, based on McClennan's financial problems and petitioner's financial success, respondent argues that the transaction was shaped *271 by tax avoidance. Petitioner, however, owned many properties. Based on petitioner's history of real estate investment, and given the differing goals of the parties and the common usage of net-net leasing in real estate, we find the instant transaction was imbued with tax-independent considerations. Based on our finding that the transaction in the instant case was a multi-party transaction with economic substance, compelled by business realities and not shaped solely by tax avoidance, we hold that the transaction was a valid sale-leaseback. Having found for petitioner on the issue of the sale-leaseback issue, we turn to respondent's alternative argument that the $70,000.00 management fee paid by petitioner to McClennan is actually a part of the purchase price. Section 162 provides in pertinent part: (a) IN GENERAL.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including --- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; *272 * * *. The deduction of management fees as ordinary and necessary business expenses is expressly permitted under section 1.162-1(a), Income Tax Regs. Further, section 1.162-7(a), Income Tax Regs., states: The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. In finding whether an agreed payment was made for services, no one factor, including the agreement itself, is determinative. However, greater weight is accorded to the objective facts within the record than to the parties' mere statements of their intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). Petitioner claimed the $70,000.00 he paid McClennan as a business expense on his 1975 return. We uphold respondent's determination that the $70,000.00 was not deductible in 1974, and find that the fee was in substance a downpayment on petitioner's purchase of the mall. Petitioners preliminarily raise two procedural arguments. They contend that the question of the management fee was not timely *273 raised by respondent and, consequently, may no longer be raised at all. This contention is clearly wrong. The issue of the fee was first raised by the statutory notice. Petitioners were not surprised by respondent's argument. Indeed, petitioners produced extensive testimony at trial in relation to the management fee. The issue of the deductibility of the fee was fully briefed by the parties in simultaneously-filed briefs.The issue, though not expressly covered by the pleadings, was raised at trial and is properly before the Court. Rule 41(b)(1). Petitioners also argue that the issue of whether the fee is nondeductible because it was a downpayment on the mall constituted a "new matter" with respect to which Rule 142(a) places the burden of proof on respondent. We need not consider this argument, because the trial testimony, the stipulated facts, and the documentary evidence provide a sound basis for our decision, regardless of where the burden lies. There was no necessity for petitioner to obtain the services of a manager for the mall, since under the net-net lease, McClennan assumed all the responsibilities of managing the mall. Under the agreement, petitioner's only obligation *274 was to cover the mortgage payments. No reasonable rationale exists for payment to McClennan of compensation for services. We note that, if McClennan was paid for services to be rendered over the term of the lease, the payment must be amortized rather than expensed. Bonaire Development Co. v. Commissioner,76 T.C. 789 (1981), affd. 679 F.2d 159 (9th Cir. 1982). Secondly, we consider the reasonableness of the fee and its relationship to the entire agreement. Without the repurchase agreement, McClennan would have charged $134,400.00 as a reasonable "management fee." Additionally, McClennan received the fee whether he performed for one day or for the whole eight years of the lease. Once received, McClennan had no obligation to repay the fee. Further, on exercise of the option, the repurchase price was set at $1,245,000.00, equivalent to the sum of the $70,000.00 fee plus the stated purchase price of the mall. This figure was specifically requested by petitioner and designed to recoup all his cash outlay on the purchase of Stepnorth. Petitioner must have considered the $70,000.00 fee as part of his cost in purchasing the mall, and not as an ordinary *275 expense. Thus, the fee was actually an integral part of the sale-leaseback agreement and had no relation to actual management of the property. Finally, we examine the cash received by McClennan at the time of the sale. The agreement specified that the fee consisted of the $30,000.00 McClennan received in August 1974 and the $40,000.00 paid in October 1974, after the deal was closed. McClennan got these funds as planned. However, the initial downpayment on the mall consisted of two promissory notes. One of the notes was not paid until January 1975 and the other remained unpaid until McClennan's exercise of the option in October 1976. If the $70,000.00 is considered a fee, petitioner purchased Stepnorth with no cash downpayment. Clearly, both parties viewed the $70,000.00 fee as part of the consideration for entering into the sale-leaseback and, as such, it was part of the purchase price to be amortized by depreciation, rather than expensed in 1974. Considering the objective economic realities, the $70,000.00 management fee is not deductible under section 162(a)(1) in 1974 because it was not an ordinary and necessary expense paid or incurred as compensation for personal services *276 actually rendered during 1974 in carrying on a trade or business. Therefore, we hold for respondent on this issue. We have considered the other arguments of both parties and find them unpersuasive. Based on the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner Polly West is a party to this action only by virtue of having filed joint returns in 1974 and 1975 with her husband petitioner William West. Therefore, "petitioner" in the singular form hereinafterrefers to petitioner William West.↩
3. Even though the parties stipulated to this figure, the correct figure is $1,104,118.00, as stated in the Exercise of Option to Repurchase agreement.↩
4. See Schaefer v. Commissioner,T.C. Memo. 1980-440↩.