See also 7 Cl.Ct. 119.

**TRANSAMERICA CORPORATION for itself and for all members of the Affiliated Group**

v.

**The UNITED STATES.**

**Nos. 90–79T, 91–79T.**

United States Claims Court.

Feb. 22, 1985.

Cameron W. Wolfe, Jr., San Francisco, Cal., for plaintiffs; W. Reece Bader, George G. Wolf and Orrick, Herrington & Sutcliffe, San Francisco, Cal., of counsel.

Gilbert W. Rubloff, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant; Theodore D. Peyser, Jr., Washington, D.C., of counsel.

## OPINION ON AIRCRAFT DISPOSITIONS

PHILIP R. MILLER, Judge:

The question here presented is whether plaintiff's subsidiary, Transamerica International Airways (TIA), disposed of its beneficial interest in two large aircraft in 1968 and 1969, or in 1970 and 1972; and this in

turn depends upon whether the 1968 agreement, pursuant to which the dispositions were made, was a conditional sales contract or a lease with options in the lessee to purchase, which were not exercised until 1970 and 1972. The resolution of these questions determines whether or not plaintiff was properly subjected to disallowance and recapture of depreciation deductions and recapture of investment credit on the aircraft in 1968 and 1969.

## I

During the years at issue, 1968 and 1969, TIA was a supplemental air transportation carrier operating passenger charters and civil air flights for the Defense Department, and transporting cargo.

In May 1963, TIA purchased from the Douglas Aircraft Company, a new DC–8–54 aircraft, registration number N8008F (hereinafter the "F" aircraft), for a purchase price of $6,966,447, plus $840,000 for extra equipment. In May 1965, TIA purchased a DC–8–55F aircraft, registration number N3325T (hereinafter the "T" aircraft), for $7,508,533.

In the mid–1960's, TIA ordered seven DC–8–61's and eight DC–8–63's to be delivered during the middle to late 1960's. These aircraft had a 50 percent larger seating capacity than the prior DC–8 model. As a result of the purchase of the larger "stretch jets", TIA decided to standardize its fleet and offer its two smaller, less efficient aircraft (the aircraft at issue) to another air carrier.

In the mid–1960's, Saturn was a supplemental air carrier and competitor of TIA. In early 1968, TIA and Saturn began negotiations with respect to both the "F" and "T" aircraft. Saturn was interested in acquiring them because of the growth of its business and the resulting need for additional equipment. It was Saturn's practice both to lease and to purchase aircraft, following the latter practice in those instances in which it expected to experience a long-term need for them.

On April 30, 1968, representatives of Saturn and TIA signed three letter agreements regarding these aircraft. Letter agreement No. 1 stated that TIA agreed to lease to Saturn and Saturn agreed to lease from TIA the "T" aircraft for rental payments of $200,000 per month for a period of 8 months beginning November 1, 1968, and ending June 30, 1969, and the "F" aircraft for rental payments of $200,000 per month for a period of 5 months beginning April 1, 1969, and ending August 31, 1969. Letter agreement No. 2 stated that TIA agreed to sell and Saturn agreed to purchase each aircraft at the completion of its lease term, at $5,600,000 for the "T" aircraft and $3,900,000 for the "F" aircraft, with title to each to pass at the time of delivery to Saturn. The agreement concluded that after execution "we will then draft appropriate documents more fully describing the sale and purchase herein agreed to." Letter agreement No. 3 stated:

> We have just executed two documents relating to the Lease and Sale of aircraft N3325T and N8008F, which we both agree are binding documents on both companies. However, we both agree that in formalizing the Lease and Sale documents to reexamine the rent and sale prices (but not the total. package price) as they relate to possible accounting problems to our individual companies with any changes to be mutually agreed upon.

The "total package price" referred to in the Letter agreement No. 3 was $12.1 million for the two aircraft, consisting of the aggregate monthly payments of $2.6 million and $9.5 million in lump-sum payments.

Although the monthly payments were designated as "rentals" in the April 30, 1968, letter agreements, they actually were a part of the purchase price for the aircraft and more properly should be labelled as installment payments. Both parties regarded the combined April 30 agreements as a binding purchase and sale agreement.

On July 1, 1968, James Malone was hired by TIA as its vice-president and chief financial officer. Shortly after joining the com-

pany, Malone reviewed the file pertaining to the transfer of the two DC–8 aircraft. He noticed that as a consequence of not owning the aircraft for an 8-year period, TIA would be subject to recapture of between $520,000 and $864,000 of the investment tax credit it had previously received on its original purchase of the airplanes. As a result of Malone's analysis, TIA's officials concluded that they would ask Saturn to extend the term of the "lease".

Malone, who, together with Howard P. Huff, executive vice president, thereafter principally conducted the negotiations on TIA's behalf, reported in July 1968 to Huff and TIA board chairman Glenn Cramer that TIA had been attempting "to convert the April Agreement into a bona fide lease for both book and tax purposes", but that it had encountered difficulties because of Saturn's "basic desire to pay cash and acquire title" to the two aircraft. Apparently, in exchange for the extended term, Saturn asked for reduction in the rental component of the total package price, because Malone cautioned TIA against permitting any increase in the option price component at the conclusion of the extended term which might reduce TIA's assurance that it would be paid. He stated, "TIA is not willing to grant Saturn a walk-away right at 'market value' at the end of the lease term" and "TIA needs to specify a walk-away price at the end of the lease at a level which will give reasonable assurance of exercise by Saturn, and, also at a low enough level where we would not be afraid to take the aircraft back." [1]

Finally, Malone and Cramer took the position in the negotiations that if the lease term was extended, TIA should receive interest on the unpaid balances after the original due date for final payment provided in the April Agreement, which he proposed at 7 percent. Saturn originally re-

sisted any such interest charge, but eventually agreed to pay 0.5 percent per month (roughly 6 percent per annum) but only from the end of 1969.

The end product of their negotiations was a two part agreement dated October 25, 1968. On that date Saturn and TIA executed a document which they denominated a lease agreement. On the same date, in a separate letter, TIA stated that "In consideration of Saturn leasing from TIA the two * * * aircraft", in accordance with the terms of the lease, including the payment of rentals, "TIA hereby gives to Saturn the exclusive right and privilege of purchasing" such aircraft on the dates and for the amounts set forth in a schedule attached to the letter.

However, the October 25 agreement did not actually resolve the parties' differences with respect to their overall intent but merely papered them over, because thereafter on its books and records and in its income tax returns Saturn treated the October agreement the same as the April agreement, as a conditional sale which entitled it to depreciation deductions from the time it took delivery of the aircraft, while plaintiff treated it as a lease with options to purchase.

The pertinent terms of the lease agreement were:

(1) TIA leased to Saturn the "F" aircraft for 44 months, from November 1, 1968 through June 30, 1972, and the "T" aircraft for 39 months, from April 1, 1969 through June 30, 1972, both in airworthy condition.

(2) For the "F" aircraft Saturn would make total rental payments of $5,060,000 to TIA, at the rate of $115,000 per month for 44 months from November 1, 1968 through June 30, 1972.

(3) For the "T" aircraft Saturn would make total rental payments of $5,187,000

---

**1.** Plaintiff contends that Mr. Malone's views should not necessarily be deemed those of TIA. However, Mr. Cramer testified that Malone and Huff were the persons in the TIA organization who were closest to this transaction. Although Malone was deceased at the time of trial and the evidence attributed to him was derived from his uncross-examined discovery deposition, plaintiff was under no such disability with respect to Huff, who executed both the April and October agreements. Huff is presently board chairman of Transamerica Airlines, an affiliate of plaintiff, but plaintiff chose not to call him as a witness.

to TIA at the rate of $133,000 per month for 39 months from April 1, 1969 through June 30, 1972.

(4) Saturn would at its own cost and expense maintain hull insurance on the aircraft as follows:

(a) On the "F" aircraft, insurance of $6.2 million from October 25, 1968 through June 2, 1969, and thereafter $5.9 million.

(b) On the "T" aircraft, insurance of $6.5 million from April 1, 1969 through June 2, 1969, and thereafter $6.2 million.

(c) All insurance policies had to include TIA as a named insured.

(d) If either aircraft was damaged beyond repair at any time during the lease period, TIA would be entitled to receive the portion of the insurance proceeds as outlined in Schedule B of the lease for each month during the lease term. The amount listed for each month in Schedule B was the amount Saturn would have to pay TIA on that date to exercise its option to buy the aircraft pursuant to the contemporaneous option letter.

5. Saturn was to indemnify and hold TIA harmless against all third-party claims arising out of the operation of the aircraft (other than as a result of TIA's own negligence), and to obtain and pay for insurance against all third-party claims.

6. Saturn was responsible for the payment of all taxes, levies, or assessments against the aircraft.

7. Saturn was to maintain the aircraft in a good state of repair and in efficient operating condition in accordance with Saturn's FAA approved overhaul and maintenance programs.

8. Saturn had the right, with the approval of TIA not to be unreasonably withheld, to sublease the aircraft.

Under the concurrent option letter, on June 2, 1969 Saturn could acquire the "F" airplane for an additional $4,980,000 and the "T" airplane for an additional $5,801,-000. On the second day of each succeeding month, from July 1969 through December 1969, the option price decreased by an amount equal to the monthly rental paid by Saturn to TIA on the first day of that month. From January 2, 1970 through June 2, 1972, the option price each month decreased only by an amount equal to approximately 94 percent of the monthly rental payment. The net effect of the two October 25, 1968, agreements was that Saturn could continue to purchase the aircraft at any time from June 2, 1969 through December 31, 1969, for a total of $12.1 million in rental and option payments, the same amount as in the April 1968 agreement; but beginning in 1970, the amount Saturn had to pay would increase monthly over the $12.1 million by a one-half of one percent of the unpaid balance due on the $12.1 million. As Howard Korth, then chairman of the board and president of Saturn, and currently vice-chairman of the board of Transamerica Airlines, testified at trial, the price was established as of June 2, 1969, $12.1 million for the two aircraft. It remained the same throughout the lease term. If the options were exercised, the monthly rental payments simply served as a means by which Saturn paid the balances due on the purchase prices of the planes, with only the addition of interest on the unpaid balances from the end of 1969.

At the time the lease and option contract were executed, Saturn expected that barring unforeseen circumstances it would exercise its options to purchase the aircraft. Mr. Korth stated that the only circumstances under which Saturn might have been expected to return the aircraft to TIA were: (1) if Saturn's business deteriorated so badly that Saturn could not operate the aircraft profitably; (2) it could not sublease them; and (3) the values of the airplanes fell drastically, and Saturn could not sell them to a third-party at prices in excess of the option prices. He further testified that Saturn would not have agreed to the lease and option contract if he thought any of the above possibilities was likely.

At the time the lease was entered into, Saturn did not have any spare parts for these aircraft. On the same date that the

lease and option contract were executed, TIA also sold to Saturn such spare parts.

TIA had originally financed its purchases of the aircraft by secured loans from the Bank of America. In a letter dated November 6, 1969, the Bank of America acknowledged to Saturn the existence of the lease agreement and options to purchase between Saturn and TIA and notified Saturn of the bank's security interest in the planes. TIA remained obligated to make payments on the secured loans and in fact continued to make these payments during the term of the lease. On February 25, 1970, Saturn by letter acknowledged the bank's security interest and agreed that, if the bank elected to accelerate payment of the loans, Saturn would thereafter make all payments to the bank on condition that the bank not interfere with the company's continued use and possession of the airplanes.

On June 11, 1970, Saturn notified TIA of its intention to exercise its option with respect to the "T" airplane as of August 2, 1970. Saturn, having previously paid TIA $2,128,000 in rentals (including interest from 1970) for 16 months, made a lump-sum payment to TIA of $4,120,000 on August 2. Saturn exercised its option to purchase this airplane because it had earlier arranged to sell the aircraft to another airline at a price above the option price. Immediately after acquiring title to the "T" airplane, Saturn sold the airplane to the other airline.

On November 17, 1971, Saturn notified TIA of its intention to exercise its option with respect to the "F" airplane. In June 1972, Saturn paid TIA $1,239,000 to purchase the aircraft. As of that date, Saturn had paid TIA $5,060,000 in rentals (including interest from 1970) over 44 months. The "F" airplane was eventually resold by Saturn for approximately $3 million above the option price.

In its federal income tax returns for 1968, TIA claimed a depreciation deduction of $103,462 for the "F" airplane. However, the Commissioner of Internal Revenue determined that TIA had made a conditional sale and disposition of the "F" aircraft in that year and disallowed the depreciation deduction. The Commissioner also increased TIA's taxable income by $2,434,-749 for depreciation recapture under Section 1245 of the Internal Revenue Code and increased the corporation's tax liability by $340,149 for investment tax credit recapture pursuant to Section 47 of the Code.

On its federal tax return for 1969, plaintiff claimed depreciation deductions for both the "F" and "T" airplanes in the amount of $1,194,448. The Commissioner disallowed this deduction on the ground that TIA had made a conditional sale and disposition of the "F" aircraft in the prior year and of the "T" aircraft in that year. Also, the Commissioner increased TIA's taxable income by $3,684,484 for depreciation recapture on the "T" aircraft and increased the company's tax liability by $330,271 for investment tax credit recapture on the "T" aircraft.

## II

Plaintiff contests the Commissioner's recharacterization of the transactions as conditional sales and argues that the form of the transactions was necessitated by valid business considerations and therefore the labels used by the parties to describe the transactions should be controlling for tax purposes. On the other hand, defendant argues that the agreement and the circumstances surrounding its execution indicate that the parties intended sales and therefore the Commissioner's recharacterization should be sustained.

For the reasons stated hereinafter, it is concluded that, while there is some ambiguity, defendant's view of the transactions is more in keeping with reality than is that of plaintiff.

*Williston on Contracts*, § 966, 459–63 (Vol. 8, 3d ed. 1964), states with respect to a conditional sale contract:

In a conditional sale, where goods are delivered to the buyer but title is retained by the seller until the price is paid, the buyer immediately acquires the right to use the goods as his own, and has,

indeed, exactly the same power over them and right in regard to them that he would have if he had bought them and mortgaged them back to secure the price.

There is no prescribed form for a conditional sale contract. The rights and liabilities of the parties thereto, as in any other kind of a contract, must be determined by the language used and the intention deducible from the terms employed in the contract. Nor, as the courts have often said, does it matter whether the parties have denominated their agreement an absolute sale, a chattel mortgage, a hire-purchase agreement or a lease: * * *. [Citations omitted.]

■ Under the tax law as well, it is long established that a sale pursuant to which possession of property is delivered to the purchaser may be deemed a closed transaction to which income tax consequences attach despite the facts that transfer of title is made conditional upon final payment of all installments of the purchase price, that the purchaser may not in fact complete payment, and that the seller may yet reclaim possession of the property upon such nonpayment. *Commissioner v. South Texas Co.*, 333 U.S. 496, 502–03, 68 S.Ct. 695, 699–700, 92 L.Ed. 831 (1948); *Burnet v. S. & L. Bldg. Corp.* 288 U.S. 406, 413, 53 S.Ct. 428, 430, 77 L.Ed. 861 (1933); *Wiseman v. Scruggs*, 281 F.2d 900, 902–03 (10th Cir.1960); Treas.Reg. § 1.1245–1(a)(3) (1966), T.D. 6832, 1965–2 C.B. 292, 300. ("[A] disposition [triggering recapture of depreciation] occurs upon a sale of property pursuant to a conditional sales contract even though the seller retains legal title to the property for purposes of security.").

■ It is also well established that the intent of the parties and the actual effect of their instrument rather than their designation control as to the nature of the transaction; for, as tersely stated in frequently quoted language in *Oesterreich v. Commissioner*, 226 F.2d 798, 801–02 (9th Cir. 1955):

If the parties enter into a transaction which they honestly believe to be a lease but which in actuality has all the elements of a contract of sale, it is a contract of sale and not a lease no matter what they call it nor how they treat it on their books.

and also in *Sun Oil Co. v. Commissioner*, 562 F.2d 258, 262 (3rd Cir.1977), *cert. denied*, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978):

Regardless of whether the parties honestly believe the transaction to be a lease, where the documents they have executed fully embody the elements of their bargain it is the documents themselves, not the parties' conceptions of them, which must govern the legal characterization of the transaction.

*See also M & W Gear Co. v. Commissioner*, 446 F.2d 841, 844 (7th Cir.1971); and *Western Contracting Corp. v. Commissioner*, 271 F.2d 694, 699 (8th Cir.1959).

■ As in all tax refund suits, the burden is on the plaintiff to prove that the Commissioner's characterization of the transaction as a conditional sale was erroneous. *Lewis v. Reynolds*, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *Dysart v. United States*, 169 Ct.Cl. 276, 340 F.2d 624 (1965).

The factors which lead to the conclusion that the October 25, 1968, agreement was intended to be and was in substance a conditional sale and not a lease are as follows:

■ First, the $115,000 and $133,000 monthly payments, labelled as "rentals" in the lease, were not actually rentals in any conventional sense, i.e., payments for the use of the lessor's property for a limited period of time, but were actually installments on the purchase price, credited to Saturn by reducing its option price pro rata (apart from the interest on the delayed payments from and after 1970). During the same year, 1968, Saturn was able to rent two other (Hercules) aircraft having a fair market value of $7 million each (considerably in excess of those of the "F" and "T" aircraft) from the Lockheed and Flying Tiger companies, for as little as $45,000 to

$50,000 per plane per month (less than half the "F" and "T" rentals"). Where monthly payments are applied to decrease an option price, it is an indication that the parties intended to enter into a sales agreement. As the court stated in *Kansas City Southern Railway v. Commissioner*, 76 T.C. 1067, 1094 (1981), "where the lessee, as a result of the rent payments, acquires something more than the mere use of the property, he is building up an equity in that property, and the payments, though denominated 'rent' in the lease instruments, do not fall within the definition of that term in the statute." *See also Sun Oil Co.*, 562 F.2d at 264, 268; *M & W Gear Co.*, 446 F.2d at 845; *Haggard v. Commissioner*, 24 T.C. 1124, 1128 (1955), *aff'd per curiam*, 241 F.2d 288 (9th Cir.1956).

Second, as of the date of the agreements, the likelihood that Saturn would not complete the purchases by making the final "option" payments was remote. As of April 30, 1968, and October 25, 1968, the parties valued the aircraft at $12.1 million and provided that Saturn was required to procure insurance in at least that sum during the entire lease term. The schedules attached to the agreements showed that by the termination date, June 30, 1972, Saturn's aggregate "rental" payments would entitle it to $9,380,000 in credit on the purchase price of the aircraft, and for Saturn to acquire title to them would only require an additional $2,720,000 payment. Thus, for Saturn not to exercise the options would mean that it would have to forfeit the $9,380,000 already paid and give up the opportunity to acquire property having a value of $12.1 million in exchange for only $2,720,000, which was not greatly in excess of its estimated salvage value of $2,212,765. Even if depreciation over the term of

the lease is factored in at the rate reflected in the record, the aircraft would still be worth at least $8,300,000 [2], and it would be just as improbable that Saturn would not exercise the options if it contemplated that the aircraft would be worth that sum. No study or report with respect to the fair market value of the two aircraft in 1968 or thereafter was offered or available. No credible evidence was introduced as to the anticipated or actual fair market value of the aircraft at the conclusion of the lease term, nor was there any evidence which indicated that the parties believed that the fair market value of the aircraft would decline so greatly as to approximate the prices on the option schedules.[3]

■ Where an option price is substantially below the contemplated fair market value of the property, it may be inferred that the parties were reasonably certain at the time they entered into the agreement that the option would in fact be exercised. *M & W Gear Co.*, 446 F.2d at 846; *Oesterreich*, 226 F.2d at 802–03.

■ Third, the intention of the parties to enter into a sale and not a lease is also evidenced by the fact that, beginning in 1970, Saturn was charged interest each month on the unpaid balance of the option prices. This was accomplished by reducing Saturn's credit for its monthly "rent" by 0.5 percent of the unpaid balance. The undisputed testimony of Messrs. Malone and Korth, as well as Malone's worksheets and memoranda show that this was intended as interest on the delayed payment of the purchase prices. The fact that an interest factor was added to the unpaid balance in the transaction is a further indication that the parties intended to enter into a sales agreement and that the unpaid bal-

---

**2.** Glenn Cramer, TIA's chairman of the board and chief executive officer, testified that as of 1968 such aircraft were being depreciated by the air carrier industry over an estimated 12-year useful life with a 10 percent residual value. On a $12.1 million cost this would result in $75,694 monthly depreciation, or $3,784,700 over the 50-month term of the lease, leaving $8,315,300 as the contemplated remaining value of the aircraft at the termination of the lease.

**3.** As has previously been noted, Malone advised TIA to fix the option prices well below fair market value so that Saturn would not be free to "walk-away" from the purchases. The fact that Saturn exercised both options and made substantial profits by reselling the aircraft to third parties also confirms that the option prices were below fair market value.

ance of the consideration therefor was recognized to be owed. *See M & W Gear Co.*, 446 F.2d at 846; *Mt. Mansfield Television Inc. v. United States*, 239 F.Supp. 539, 544 (D.Vt.1964); *aff'd per curiam*, 342 F.2d 994 (2d Cir.), *cert. denied*, 382 U.S. 818, 86 S.Ct. 43, 15 L.Ed.2d 65 (1965); *Judson Mills v. Commissioner*, 11 T.C. 25, 33–35 (1948); and *Swigart v. Commissioner*, 49 T.C.M. (P–H) ¶ 80,379 (1980).

■ Fourth, under the October 25 agreement the risk of damage to the aircraft was shifted to Saturn. The contract required Saturn to pay for and maintain hull insurance on the aircraft, and, if the aircraft were damaged beyond repair, to pay TIA the option prices as of the dates of destruction. Also, it was required to pay for insurance policies to relieve TIA of any liability due to breach of warranty and to indemnify TIA for any liability to third persons resulting from the operation of the aircraft. Finally, the contract required that Saturn maintain the aircraft in accordance with FAA standards and keep the aircraft and their engines in a good state of repair. The assumption by the transferee of the burden of all insurance costs as well as the duty to repair is another indication that the parties intended to enter into a conditional sale as opposed to a lease. *Swift Dodge v. Commissioner*, 692 F.2d 651, 653 (9th Cir.1982); *Sun Oil Co.*, 562 F.2d at 263; *Mt. Mansfield Television Inc.*, 239 F.Supp. at 544.

■ Fifth, that the parties intended to enter into a sales agreement rather than a lease is also reflected in the provisions of the October 25 agreement governing the distribution of insurance proceeds in the event that either airplane was damaged beyond repair during the term of the contract. The agreement provided that TIA would only be entitled to receive insurance proceeds equal to the additional amount Saturn would have had to pay to exercise its option to purchase on the date of destruction. Thus, with each monthly payment, Saturn increased its entitlement to insurance proceeds, presumably to protect

its increasing investment in the aircraft. But how would Saturn come to have an insurable interest in the aircraft during the lease term which increased pro rata as the lease ran out, if it were merely a lessee of the property? When the lessee acquires rights beyond mere use and possession of the equipment and with his payments builds up an equity interest in the property, this is a further indication that the agreement is in substance a conditional sale and not a lease. *Kansas City Southern Railway*, 76 T.C. at 1094; *Haggard*, 24 T.C. at 1128.

■ Sixth, the intention of the parties to enter into a sale of the aircraft is found in the sale by TIA to Saturn of the spare parts for the aircraft at the inception of the lease. It is unlikely that Saturn would have purchased TIA's spare parts had it intended to return the aircraft at the end of the lease period. It would be reasonable to expect Saturn to purchase only those items it actually needed to repair the aircraft during the lease term if it did not intend to exercise its options. *Cf. M & W Gear Co.*, 446 F.2d at 846.

■ Finally, the fact that on its books and in its income tax returns Saturn treated the acquisition of the aircraft as a purchase under a conditional sales contract, which entitled it to take deductions for depreciation from the time it took possession, must be given some weight in assessing the intent of the parties. *Cf. M & W Gear Co.*, 446 F.2d at 846; *Lemon v. United States*, 115 F.Supp. 573, 577 (W.D.Va. 1953).

Plaintiff claims that it remained subject to the risks of an owner during the years at issue because Saturn might have decided not to exercise its options to purchase the aircraft at the termination of the lease. However, plaintiff protected itself against loss from depreciation of the property by requiring Saturn to pay it $248,000 per month "rental" for the two aircraft, while their estimated depreciation was only $75,-

694 per month.[4] Plaintiff protected itself against loss in market value by making the rental component of the purchase price for each sufficiently high and the remaining balance at the termination of the lease sufficiently low that the possibility that Saturn would not exercise the option was remote; and, thus, even in the event that Saturn did not exercise the option, plaintiff could sell the aircraft at a price which was at least as high as the remaining balance. This is not substantially different than the situation under a conditional sales contract generally. A seller under such a contract has similar risks that the buyer may fail to make a final or balloon payment, requiring the seller to repossess the property and resell it in order to recoup the unpaid balance on the sales price. Ordinarily the seller protects himself against loss upon such eventuality by setting the down payment and the remaining installment sufficiently high as to offset the possibility of loss in value on the resale. Thus, despite the form of the agreements, the combined lease and option agreements herein were still not different in substance from a conditional sales agreement. *Cf. Swift Dodge*, 692 F.2d at 653–54.

### III

Plaintiff contends that the traditional method of determining whether an agreement is a lease or a conditional sale, by objective analysis and balancing of the various elements in the agreement, is "outdated" and no longer appropriate, because the decision in *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978), "has changed the law as to whether a transaction structured as a lease can be recharacterized as a conditional sale for tax purposes." As plaintiff sees it, if there are legitimate business motivations, apart from tax avoidance, for structuring an agreement as a lease, "the sole question is whether the lessor retained *some* attributes of a traditional lessor. If so, the transaction is to be treated as a lease for tax purposes."

Plaintiff is mistaken as to the meaning and scope of the *Frank Lyon* decision. The issue there was as to the bona fides of a bank's sale and leaseback of an office building with options to purchase. The Commissioner of Internal Revenue took the position that the transaction in its entirety should be regarded as a sham, and that Lyon, the purchaser-lessor, was not the owner of the building but a mere conduit in a financing scheme, used to forward the mortgage payments, made under the guise of rent, to the mortgagee, and that, as a result, various items of income and expenses relating to the building were not allowable to Lyon for income tax purposes. The Court held, however, that the transaction was not a sham and Lyon was the owner, because of the district court's findings: that the parties intended to create a bona fide sale-and-leaseback in accordance with the form of the documents; that the rents were unchallenged and were reasonable throughout the period of the lease; that the option prices, negotiated at arm's length between the parties, represented fair estimates of market value on the applicable dates; that the bank-lessee would acquire an equity in the building only if it exercised one of its options to purchase; and that there was no understanding and it was highly unlikely, as a practical matter, that any purchase option would ever be exercised. The Court further relied upon the facts that the bank was under state and federal regulatory restraints which prevented it from acquiring the real estate itself; that Lyon independently borrowed $500,000 from a third-party insurance company to make the purchase and was solely liable on the note; that Lyon had the risks associated with depreciation and variations in the value of the real estate and the rents; and that there was an absence of any tax advantage to the parties from the arrangement.

In confirmation of its view that the Supreme Court has now adopted a new rule that a transaction in the form of a lease is not to be analyzed objectively but is to be

**4.** See footnote 2, *supra*.

recognized as such for tax purposes unless there are no non-tax motives for the arrangement, plaintiff relies on the following concluding paragraph from *Frank Lyon*, 435 U.S. at 583–84, 98 S.Ct. at 1303–04:

In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes. What those attributes are in any particular case will necessarily depend upon its facts. It suffices to say that, as here, a sale-and-leaseback, in and of itself, does not necessarily operate to deny a taxpayer's claim for deductions.

Plaintiff construes the *Frank Lyon* decision too broadly. First, even in the context of the sale and leaseback issue which was there involved, the *Frank Lyon* decision did not repudiate the rule of substance over form. It reiterated that (*Id.* at 572–73, 98 S.Ct. at 1297–98):

In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. * * * In applying this doc-

trine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," * * as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding." * * * Nor is the parties' desire to achieve a particular tax result necessarily relevant. [Citations omitted.]

Second, *Frank Lyon* did not involve the same question as that herein. *Frank Lyon* involved a sale-and-leaseback situation, and the issue was whether or not the agreement reached actually changed ownership or possession of the building, or was merely a sham designed solely to avoid adverse tax consequences. Here, there is no dispute that a transfer occurred. The question at issue is only as to whether the proper characterization of the transaction is a lease or conditional sale. The Supreme Court itself took note of the fact that the two questions were of a different nature when it pointed out that although there was an Internal Revenue Service ruling which set forth the Service's most complete statement for characterizing a transaction as a lease or conditional sale of equipment, the ruling gave Lyon very little guidance against which to measure the genuineness of a sale-and-leaseback in a real estate transaction.[5]

---

5. The court stated (*Frank Lyon*, 435 U.S. at 578 n. 14, 98 S.Ct. at 1300 n. 14):

Then-existing pronouncements of the Internal Revenue Service gave Lyon very little against which to measure the transaction. The most complete statement on the general question of characterization of leases as sales, Rev.Rul. 55–540, 1955–2 Cum.Bull. 39, by its terms dealt only with equipment leases. In that ruling it was stated that the Service will look at the intent of the parties at the time the agreement was executed to determine the proper characterization of the transaction. Generally, an intent to enter into a condition-

al sales agreement will be found to be present if (a) portions of the rental payments are made specifically applicable to an equity acquired by the lessee, (b) the lessee will acquire a title automatically after certain payments have been made, (c) the rental payments are a disproportionately large amount in relation to the sum necessary to complete the sale, (d) the rental payments are above fair rental value, (e) title can be acquired at a nominal option price, or (f) some portion of the rental payments are identifiable as interest. See also Rev.Rul. 60–122, 1960–1 Cum.Bull. 56; Rev.Rul. 72–543, 1972–2 Cum.Bull. 87.

Another important difference is that the *Frank Lyon* decision is premised on acceptance of the district court's findings previously summarized (*see id.* at 569, 581–82, 98 S.Ct. at 1302–03), while the evidence herein leads to quite different findings.

▮▮▮▮ Other courts which have considered whether a particular transaction is a lease or a conditional sale likewise have not construed *Frank Lyon* as laying down a new determinative subjective intent test, as plaintiff urges. Instead, these courts have continued to apply the objective substance versus form analysis utilized herein. *See Swift Dodge v. Commissioner*, 692 F.2d 651 (9th Cir.1982); *Leslie Leasing Co. v. Commissioner*, 80 T.C. 411 (1983); and *Kansas City Southern Railway v. Commissioner*, 76 T.C. 1067 (1981).

Finally, plaintiff relies on the Supreme Court's reasoning that because the bank-Lyon transaction also involved a third-party, the insurance company which financed the transaction, it cannot reasonably be inferred that the transaction between the first two parties alone was a sham. Plaintiff points to the Bank of America's securities interest in the two aircraft and argues that that Bank's role requires that the court treat the October 25, 1968 agreement as a lease in accordance with its form rather than as a conditional sale. Plaintiff's reasoning is not persuasive. The Bank of America financed TIA's original purchase of the two aircraft in 1963 and 1965 and held a security interest in them, but it did not play an active role in the transaction between TIA and Saturn in 1968. The record reflects that in February 1970 Saturn wrote to the bank acknowledging the latter's security interest and agreed that if the bank elected to require acceleration of payment of the loans, Saturn would transmit directly to the bank all amounts payable under the lease and purchase option agreement, and TIA and the Bank consented to this arrangement. Thus, the role of the Bank of America is not incompatible with the determination that in the circumstances herein there was a conditional sale. Indeed, Saturn's agreement as early as

February 1970, to pay TIA's debt to the bank, before it exercised its options with respect to the aircraft, would seem to further the conception that there was a conditional sale rather than a lease.

### Conclusion

Plaintiff claims and defendant concedes that if the transaction at issue is a conditional sale plaintiff is entitled to report its income on the sale pursuant to the installment method, as provided in Section 453 of the Internal Revenue Code. With the exception of this contention, plaintiff's claims with respect to the aircraft leasing issue will be dismissed.