T.C. Memo. 2015-84

UNITED STATES TAX COURT

COASTAL HEART MEDICAL GROUP, INC., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 145-11, 146-11,        Filed May 4, 2015.
8695-12, 8696-12.

John Alan Harbin, Joseph P. Wilson, and Daniel W. Layton, for petitioners.

Katherine Holmes Ankeny and Jeri L. Acromite, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, Judge: Respondent issued a notice of deficiency to Anil V. Shah

(Dr. Shah) and Preeti A. Shah (Mrs. Shah) (Shahs, collectively), for tax years 2004

_____

[1]Cases of the following petitioners are consolidated herewith: Anil V. Shah
and Preeti A. Shah, docket Nos. 146-11 and 8695-12; and Coastal Heart Medical
Group, Inc., docket No. 8696-12.

[*2] through 2006. Respondent contemporaneously issued Dr. Shah's solely owned corporation--Coastal Heart Medical Group, Inc. (Coastal Heart), a notice of deficiency for fiscal years ending July 31, 2004, 2005, and 2006. Respondent issued separate notices of deficiency to the Shahs for the 2007 tax year and to Coastal Heart for fiscal years ending July 31, 2007 and 2008. Petitioners' cases were consolidated for trial, briefing, and opinion. The following deficiency determinations and penalty are at issue for the Shahs:[2]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2004 | $108,435 | n/a |
| 2005 | 96,065 | n/a |
| 2006 | 72,259 | n/a |
| 2007 | 105,747 | $21,149 |

The following deficiency determinations and penalties are at issue for Coastal Heart:

| FYE July 31 | Deficiency | Penalty sec. 6662(a) |
|-------------|-----------|----------------------|
| 2004 | $53,520 | $10,704 |
| 2005 | 38,621 | 7,724 |

---

[2]All section references are to the Internal Revenue Code as in effect for the tax years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

| | | |
|---|---|---|
| [*3] 2006 | 54,519 | 16,051 |
| 2007 | 135,568 | 27,113 |
| 2008 | 45,396 | 9,079 |

After concessions, the issues for decision are: (1) whether the Shahs improperly claimed a nonpassive loss deduction from Coastal Imaging Center, LLC (Coastal Imaging), for 2004; (2) whether the Shahs received unreported income in the form of a constructive dividend from Coastal Heart in 2004; (3) whether the Shahs improperly claimed nonpassive loss deductions for 2005-07 from various entities Dr. Shah managed; (4) whether Coastal Heart improperly included the gross income of Coastal Imaging and improperly claimed deductions that belonged to Coastal Imaging for 2004-06; and (5) whether the Shahs and Coastal Heart are liable for accuracy-related penalties. We answer all five questions in the affirmative.

## FINDINGS OF FACT

The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. The Shahs resided in California when their petitions were filed. Coastal Heart's principal place of business was in California when its petitions were filed.

**[*4]** <u>The Shahs' Claimed Loss From Coastal Imaging and Constructive Dividend</u>

Dr. Shah is a cardiologist who conducts his medical practice through Coastal Heart. On November 4, 2003, Coastal Heart leased[3] a cardiac CT scanner from Siemens Medical Solutions USA, Inc. (Siemens), for a 60-month term. Dr. Shah signed the lease on behalf of Coastal Heart, and the lease was secured by a $500,000 life insurance policy on Dr. Shah naming Siemens as the beneficiary. The lease provided that Coastal Heart could not assign or dispose of its rights or obligations under the lease or enter into any sublease without Siemens' written consent. The lease also included an option to purchase the CT scanner at less than fair market value. At the end of the 60-month term, the lease was extended for another 18 months. Coastal Heart was the signatory on the lease renewal agreement.

On January 25, 2004, Coastal Heart paid $4,000 to Zabala Custom Constructions for construction work to accommodate the CT scanner. The construction work included erecting new lead walls to assist with the functionality of the scanner and housing the scanner on the bottom floor of Coastal Heart's new two-story office.

---

[3]We find that the transaction between Coastal Heart and Siemens was a conditional purchase rather than a lease. However, for simplicity we use the terms "lease" and "purported lease" interchangeably.

[*5]  In 2004 Dr. Shah formed Coastal Imaging, a registered California limited liability company, with two other individuals to manage the CT scanner.[4]  One of these individuals was a doctor, and the other was Dr. Shah's former patient.  Dr. Shah was the managing member of Coastal Imaging.

For the 2004 tax year the Shahs asserted that Dr. Shah had personally guaranteed the lease of the CT scanner and claimed a nonpassive loss deduction from Coastal Imaging of $291,985.  Because the Shahs did not provide a copy of the guaranty, respondent determined that Dr. Shah did not have enough basis in Coastal Imaging to cover the entire loss.  Therefore, respondent disallowed $272,244 of the loss deduction.  Respondent also determined that the Shahs received a $4,000 constructive dividend from Coastal Heart for the 2004 tax year because of the construction work performed by Zabala Custom Constructions.

Dr. Shah's Claimed Real Estate Activities

In 2004 Tenant Healthcare (Tenant), the company that owned the hospital where Dr. Shah was a leading physician, decided to sell that hospital and four others in the region.  Dr. Shah thought it would be a good idea if the physicians

---

[4]For Federal income tax purposes, Coastal Imaging reported on its Forms 1065, U.S. Return of Partnership Income, for 2004 through 2008, and we so find, that Coastal Imaging is a partnership not subject to the TEFRA partnership audit and litigation procedures of secs. 6221 through 6234.  See sec. 301.7701-3(a) and (b)(1)(i), Proced. & Admin. Regs.; see also sec. 6231(a)(1)(B).

[*6] themselves owned and operated the hospitals, so he placed a bid for the hospitals. To facilitate the transaction, Dr. Shah became the executive chairman of Integrated Healthcare Holdings, Inc. (IHHI), a hospital acquisition and management company. Dr. Shah raised capital for the purchase of the hospitals through an entity called the Orange County Physicians Investment Network (OCPIN). OCPIN was made up of various physician investors with Dr. Shah as manager. To ensure that the physicians would own the hospitals, OCPIN bought a controlling stake in IHHI. In 2005 after a year of deliberation, negotiation, and State Senate meetings in Sacramento, IHHI bought the hospitals from Tenant for $57 million. Dr. Shah testified that he spent around 16 hours a day negotiating the transaction with Tenant.

As executive chairman of IHHI, Dr. Shah was responsible for setting the overall strategies and direction of the company, monitoring and overseeing corporate performance, and guiding the board of directors in its oversight of the corporate activities and performance. IHHI compensated Dr. Shah for his role as executive chairman. After the sale, IHHI immediately split the real estate holdings portion of the transaction from the hospital operations aspect. In that respect, Pacific Coast Holdings Investment, LLC (PCHI), would own the properties

[*7] purchased from Tenant and IHHI would manage the operations of the hospitals. After the division, $50 million of the investment belonged to PCHI and $7 million belonged to IHHI.

In order for the physicians and Dr. Shah to maintain an interest in the real estate portion of the deal, an entity called West Coast Holdings, LLC (West Coast), was formed to be a substantial investor in PCHI. West Coast had an ownership structure similar to OCPIN's, and Dr. Shah managed West Coast and comanaged PCHI.

Thereafter, PCHI leased the hospital properties purchased from Tenant to several different hospitals. Because the leases to these hospitals were "triple-net leases", the hospitals themselves were responsible for routine maintenance and repairs, not PCHI. Instead, Dr. Shah's duties as a comanager for PCHI during the years at issue were negotiating leases with the other hospitals, dealing with lawsuits pertaining to the transactions, and avoiding bankruptcy. Dr. Shah also spent time finding investors for the hospitals, refinancing loans used for the purchase of the hospitals, and obtaining guaranties on two properties that PCHI rented instead of owned.

The Shahs also managed RPS, LLC (RPS), during the years at issue. RPS owned the 30-suite office building where Coastal Heart's office and the CT

[*8] scanner were located. As property managers of RPS, the Shahs collected rents for the building, prepared the leases, took care of maintenance and repairs throughout the building, and managed the utilities.

For each of the taxable years at issue the Schedule E, Supplemental Income and Loss, that petitioners filed contained the following warning: "Caution: Your rental real estate loss * * * may be limited. * * * Real estate professionals must complete line 43 on page 2." Despite this statement, petitioners left blank line 43 of Schedule E, dealing with "Reconciliation for Real Estate Professionals".

Petitioners did not make an election to group activities together for purposes of measuring material participation, nor did they elect to treat all of their interests in rental activities as one activity.

For tax years 2005 through 2007 the Shahs claimed nonpassive losses from RPS, West Coast, OCPIN, and an entity called Danon Danon Shah Younis Singh (DDSYS). For these years respondent determined that the Shahs' losses from these entities were from rental real estate activities and therefore were passive.

Coastal Heart's Reported Income and Claimed Deductions

As sole owner and manager of Coastal Heart and Coastal Imaging, respectively, Dr. Shah maintained separate books for both entities. For the years at issue Coastal Heart reported income generated by the CT scanner for patients'

[*9] use of its heart scanning services, while Coastal Imaging claimed depreciation deductions for the CT scanner. Coastal Heart also claimed deductions related to the CT scanner including: (1) salaries and wages of three employees involved in the operation of the CT scanner; (2) repairs and maintenance of the CT scanner and the office shared by Coastal Imaging and Coastal Heart; (3) monthly rental of the shared office; (4) depreciation of office furniture in the shared office; (5) rental payments on the CT scanner lease; and (6) expenses for operating the CT scanner.

Respondent determined that Coastal Heart had improperly included the gross income and business expenses of Coastal Imaging on its corporate tax returns for tax years 2004-06. At trial Dr. Shah testified that it was Coastal Heart, not Coastal Imaging, that paid the lease on the CT scanner, paid for training and employment of special technicians for the CT scanner, was the sole tenant of the office space in which the CT scanner operated, and made the downpayment and paid the construction costs related to the CT scanner. Respondent contends that Coastal Heart and Coastal Imaging are separate and distinct entities and that expenses and income related to the CT scanner should be allocated to Coastal Imaging.

For the years at issue the Shahs and Coastal Heart had the same accountant prepare their tax returns.

**[\*10]**                                     OPINION

## I.     Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). The evidence does not establish that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact.

We will first discuss the three remaining and somewhat disparate issues related directly to the Shahs' tax liabilities and then discuss the tax issues of Coastal Heart. Finally, we will discuss the penalty issues for both the Shahs and Coastal Heart.

## II.     The Shahs' Tax Liabilities

### A.     The Shahs' Claimed Nonpassive Loss Deduction From Coastal Imaging for 2004

Coastal Imaging was a registered California limited liability company with three members. For Federal income tax purposes, an LLC with more than one member generally is treated as a partnership unless it elects to be treated as an association (i.e., a corporation). <u>See</u> sec. 301.7701-3(a) and (b)(1)(i), Proced. &

**[\*11]** Admin. Regs. Coastal Imaging did not make an election to be treated as a corporation, and for tax purposes it is treated as a partnership.

A partnership is not subject to Federal income tax at the partnership level; instead, persons carrying on business as partners are liable for income tax only in their separate or individual capacities. Sec. 701; see secs. 702, 704 (providing rules for determining partners' distributive shares), sec. 703 (providing rules for computing taxable income of a partnership). A partner must take into account his or her distributive share of each item of partnership income, gain, loss, deduction, and credit. Sec. 702(a); Vecchio v. Commissioner, 103 T.C. 170, 185 (1994).

Section 704(d) limits the deductibility of a partner's distributive share of partnership losses. Those losses are deductible only to the extent of the adjusted basis of a partner's interest in the partnership. Sennett v. Commissioner, 80 T.C. 825 (1983), aff'd, 752 F.2d 428 (9th Cir. 1985). A partner's adjusted basis in the partnership is essentially the partner's contribution to the partnership increased by the partner's distributive share of partnership income and decreased by all cash distributions and the partner's distributive share of partnership losses. Sec. 705(a). If a partner's distributive share of partnership losses is greater than the partner's available adjusted basis, the excess loss cannot be deducted by the partner for that year but must instead be carried forward until the partner has an adjusted basis

**[\*12]** sufficient to offset the amount of the loss.  <u>See</u> sec. 1.704-1(d)(1), Income Tax Regs.

Generally, when a partner contributes property subject to a liability to a partnership, the partnership is treated as having assumed the liability.  Sec. 1.752-1(e), Income Tax Regs.  When a partnership assumes an individual partner's liabilities, the assumption of those liabilities results in a deemed distribution to the partner and, consequently, decreases the basis of the partner's interest in the partnership by the amount assumed by the partners.  Sec. 752(b).  Conversely, when a partner assumes the partnership's liabilities, the assumption of such liabilities results in a deemed contribution by the partner to the partnership and, consequently, increases the basis of the partner's interest in the partnership by the amount assumed.  Sec. 752(a); sec. 1.752-1(b), Income Tax Regs.; <u>see</u> <u>HGA Cinema Trust v. Commissioner</u>, 950 F.2d 1357, 1362 (7th Cir. 1991), <u>aff'g</u> T.C. Memo. 1989-370; <u>Callahan v. Commissioner</u>, 98 T.C. 276, 280 (1992).  A partner may assume a partnership's liabilities when the partner contributes property subject to a liability to a partnership but remains personally liable to the creditor and none of the other partners bear any of the economic risk of loss for the liability under State law or otherwise.  <u>See</u> sec. 1.752-1(g), (Example) (<u>1</u>), Income Tax Regs.

[*13] For the 2004 tax year the Shahs claimed a nonpassive loss deduction from Coastal Imaging of $291,985. Respondent concedes that Dr. Shah materially participated in Coastal Imaging for purposes of the section 469 passive activity loss rules[5] but argues that the loss from Coastal Imaging was limited to the adjusted basis of his interest in Coastal Imaging.

Petitioners argue that Dr. Shah had sufficient basis in Coastal Imaging to claim the loss deduction because Dr. Shah personally guaranteed the lease. In the alternative, petitioners argue that Coastal Heart was obligated to pay the lease, and because Coastal Heart was related to Dr. Shah, Dr. Shah had sufficient basis to claim the loss deduction. Petitioners' arguments assume that the lease was a partnership liability--in other words, a liability to Coastal Imaging. Normally, an obligation to make payments under an operating lease is not characterized as a liability. See CSX Transp., Inc. v. Ga. State Bd. of Equalization, 448 F. Supp. 2d 1330, 1349 (N.D. Ga. 2005), aff'd, 472 F.3d 1281 (11th Cir. 2006), rev'd on other grounds, 552 U.S. 9 (2007). However, if the terms of the lease give rise to a conditional purchase, the lease will be characterized as a liability. Id.; see also Yearout Mech. & Eng'g, Inc. v. Commissioner, T.C. Memo. 2008-217, slip op. at

_____

[5]For a detailed discussion of the passive activity loss rules see infra section titled "The Shahs' Claimed Nonpassive Losses for 2005 through 2007".

**[*14]** 27 n.22. Petitioners were simultaneously characterizing the lease with Siemens as a lease and a conditional purchase by Coastal Heart: Coastal Heart was claiming rental deductions on the CT scanner as if it were leasing the scanner, while Coastal Imaging was claiming depreciation deductions on the CT scanner as if it owned the scanner. We therefore need to examine the details of the lease. Although there are no specific provisions in the U.S. tax laws governing the differentiation of true leases and conditional purchases, the substance of the transactions, not the form, will govern the nature of the lease. See Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 255 (1939); Gregory v. Helvering, 293 U.S. 465, 470 (1935). With respect to the transfer of equipment, courts have stated that factors indicating that a conditional purchase more likely exists include: (1) the lease term extends throughout the equipment's entire useful life, Mt. Mansfield Television, Inc. v. United States, 239 F. Supp. 539, 543 (D. Vt. 1964), aff'd, 342 F.2d 994 (2d Cir. 1965); (2) the sum of the rental payments approximately equals the cost of the equipment, Chi. Stoker Corp. v. Commissioner, 14 T.C. 441, 445 (1950); and (3) the lessee has an option at the end of the agreement to purchase the equipment at a nominal or below-market price, Transam. Corp. v. United States, 7 Cl. Ct. 441, 448 (1985).

**[\*15]** The CT scanner is high-technology medical equipment, and its useful life is five years. See sec. 168(e)(3)(B)(iv), (i)(2)(A)(iii), (C). The term of the purported lease is 60 months--five years. Therefore, the term extends throughout the CT scanner's entire useful life. Furthermore, the parties agree that Coastal Heart had an option to purchase the CT scanner at the end of the purported lease term at a less-than-fair-market price. Accordingly, we characterize the purported lease of the CT scanner as a conditional purchase by Coastal Heart. As a conditional purchase, the purported lease gave rise to a liability to Coastal Heart. We now need to determine whether the liability was transferred to Coastal Imaging--i.e., if it was a partnership liability.

Section 752 applies only to partnership liabilities. The regulations define a liability for section 752 purposes as any obligation that gives rise to: (1) the creation of, or an increase in, the basis of property owned by the obligor (including the cash attributable to borrowings), (2) an immediate deduction, or (3) an expenditure that is not deductible in computing taxable income and not properly chargeable to capital account.[6] Sec. 1.752-1(a)(4), Income Tax Regs.

─────────────

[6]The temporary regulations issued in 1988 used this same definition of a partnership liability. The final sec. 752 regulations adopted in 1991 excluded this definition. The change was made only for the purpose of simplification and not to change the substance of the regulation. The current sec. 752 regulations, as of

(continued...)

[*16] In order for property subject to a liability to be a partnership liability, and for section 752 to apply, the property needs to be contributed to the partnership. See id. para. (e). The CT scanner was not contributed to Coastal Imaging. Dr. Shah, not Coastal Heart, was a member of Coastal Imaging, and the CT scanner was not Dr. Shah's to contribute. Furthermore, there were no written agreements between Coastal Heart and Coastal Imaging that purported to assign the lease to Coastal Imaging. Even if there were, Coastal Heart could not have assigned the lease because the lease itself prohibited assignments without Siemens' approval. Finally, the record does not reflect that Coastal Heart intended to contribute the CT scanner to Coastal Imaging. Rather, petitioners state Dr. Shah created Coastal Imaging to simply manage the CT scanner. We conclude that the CT scanner was never contributed to Coastal Imaging. Therefore, it did not give rise to a liability of Coastal Imaging, and section 752 does not allow Dr. Shah to claim an increased basis in his interest in Coastal Imaging either through his own purported personal guaranty of the lease or Coastal Heart's obligation under the lease. Accordingly, we sustain respondent's determination to disallow $272,244 of the loss deduction that the Shahs claimed from Coastal Imaging for the 2004 tax year.

---

[6](...continued)
2005, include this definition of a liability.

**[\*17]** B. The Constructive Dividend From Coastal Heart for 2004

The determination of constructive dividend income received by Dr. Shah is a determination of unreported income. The Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie, has held that for the presumption of correctness to attach to the notice of deficiency in unreported income cases, the Commissioner "must offer some substantive evidence showing that the taxpayer received income from the charged activity." See Weimerskirch v. Commissioner, 596 F.2d 358, 360 (9th Cir. 1979), rev'g 67 T.C. 672 (1977); see also Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982). Once the Commissioner sufficiently connects the taxpayer with the unreported income, the burden shifts to the taxpayer, who must establish by a preponderance of the evidence that the deficiency determination was arbitrary or erroneous. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97.

Section 301 requires a taxpayer to include in gross income amounts received as dividends. Generally, a dividend is a distribution of property by a corporation to its shareholders out of its earnings and profits. Sec. 316(a). A dividend need not be formally declared or even intended by a corporation. Noble v. Commissioner, 368 F.2d 439, 442-443 (9th Cir. 1966), aff'g T.C. Memo. 1965-

[*18] 84. When a corporation pays the personal expenses of a shareholder without expectation of repayment, there may exist a constructive dividend distribution that is taxable to the shareholder. Magnon v. Commissioner, 73 T.C. 980, 993-994 (1980). Whether a constructive dividend exists turns on whether the distribution was primarily for the benefit of the shareholder. Hood v. Commissioner, 115 T.C. 172, 179-180 (2000). The existence of some benefit to the corporation is not enough to permit a corporate deduction; the Court must weigh the benefit to the shareholder and the corporation, and "where the business justifications put forward are not of sufficient substance to disturb a conclusion that the distribution was primarily for shareholder benefit" a constructive dividend will be found. Sammons v. Commissioner, 472 F.2d 449, 452 (5th Cir. 1972), aff'g in part, rev'g in part and remanding T.C. Memo. 1971-145. The determination of whether the shareholder or the corporation primarily benefits is a question of fact. See id. To avoid constructive dividend treatment, the taxpayer must show that the corporation primarily benefited from the payment of the shareholder's expenses. Hood v. Commissioner, 115 T.C. at 181. "In determining whether or not the expenditure related to the business of the corporation, we must ascertain whether the payment or expenditure has independent and substantial importance to the paying corporation." Gow v. Commissioner, T.C. Memo. 2000-93, slip op. at 38 (citing

[*19] T.J. Enters., Inc. v. Commissioner, 101 T.C. 581 (1993)), aff'd, 19 Fed. Appx. 90 (4th Cir. 2001). "An expenditure generally does not have independent and substantial importance to the distributing corporation if it is not deductible under section 162." Id. (citing P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084, 1088 (9th Cir. 1987), aff'g T.C. Memo. 1984-549).

We find respondent has sufficiently established an evidentiary foundation to shift the burden to the Shahs on this issue. Respondent introduced evidence that on January 25, 2004, Coastal Heart paid $4,000 to Zabala Custom Constructions to renovate and expand Coastal Heart's office in order to accommodate the operation of the CT scanner. Dr. Shah is the sole shareholder of Coastal Heart, and he is a member of Coastal Imaging, the entity that manages the CT scanner. Respondent introduced sufficient evidence to show that Dr. Shah was a beneficiary of the expansion and received unreported income through his interest in Coastal Imaging, regardless of whether Coastal Heart benefited from the expansion. The Shahs contend that they received no constructive dividend because the shared office construction was merely an incidental benefit to Coastal Imaging and did not discharge any obligation of Dr. Shah as a member of Coastal Imaging. Although the expansion provided a place to house the CT scanner leased by Coastal Heart, the CT scanner was managed by Coastal Imaging. As we have

[*20] found, respondent has provided a minimal evidentiary foundation for his determination that the expansion was primarily for Coastal Imaging's benefit and therefore Dr. Shah's benefit as a member of Coastal Imaging. On this issue we find that the Shahs failed to construct a satisfactory record to support their position. The Shahs presented no evidence apart from Dr. Shah's own testimony and did not adequately explain how Coastal Heart and Coastal Imaging worked in concert. Furthermore, there was no testimony on the interests of the other two members of Coastal Imaging and whether they differed in any meaningful way from the interests of Coastal Heart. The Shahs did not establish that respondent's determination with respect to this issue was arbitrary or erroneous. Therefore, we hold that Coastal Heart's payment of the construction fee was a corporate distribution to Dr. Shah.[7]

C. The Shahs' Claimed Nonpassive Loss Deductions for 2005-07

For tax years 2005-07 the Shahs claimed nonpassive losses from the following entities: (1) OCPIN, (2) West Coast, (3) RPS, and (4) DDSYS.

---

[7]In a recomputation of the deficiency hereunder, the parties will be permitted to submit computations of earnings and profits in accordance with this opinion to determine what portion of the payment was a taxable dividend. See Magnon v. Commissioner, 73 T.C. 980, 996-997 (1980).

**[*21]** Respondent determined that the Shahs' losses from these entities were from rental real estate activities and therefore were passive.

Although taxpayers may deduct ordinary and necessary expenses they paid or incurred during the year in carrying on a trade or business for the production of income, the Code limits the deduction for losses arising from a "passive activity". Secs. 162, 212, 469(a).

A passive activity is any trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1). A passive activity loss is the excess of the aggregate losses from all passive activities for the year over the aggregate income from all passive activities for that year. Sec. 469(d)(1). A rental activity is generally treated as a per se passive activity regardless of whether the taxpayer materially participates. Sec. 469(c)(2). There are special rules under section 469(c)(7) that allow a taxpayer in the real property business (real estate professional) to deduct rental losses against all income provided that the taxpayer materially participates in the rental activity. See also sec. 1.469-9(e)(1), Income Tax Regs.

The Shahs assert that they are entitled to deduct their rental losses for 2005-07 and that these losses are not subject to the passive activity loss limitations under section 469. They contend that Dr. Shah qualifies as a real estate

[*22] professional under section 469(c)(7) and that he materially participated in his rental activities. The Shahs do not contend that Mrs. Shah qualifies as a real estate professional.

Under section 469(c)(7)(B), a taxpayer qualifies as a real estate professional and a rental real estate activity of the taxpayer is not a per se passive activity under section 469(c)(2) if:

> (i) more than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and

> (ii) such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.

In the case of a joint return, the above requirements are satisfied if and only if either spouse separately satisfied these requirements. Sec. 469(c)(7)(B). Thus, if either spouse qualifies as a real estate professional, the rental activities of the real estate professional are exempt from being a per se passive activity under section 469(c)(2). Instead, the real estate professional's rental activities would be subject to the material participation requirements of section 469(c)(1). Sec. 1.469-9(e)(1), Income Tax Regs.

[*23] Since the Shahs are claiming deductions for losses from OCPIN, West Coast, RPS, and DDSYS, we need to examine whether any of these entities were engaged in rental activities for section 469(c)(7) to apply. We also need to examine whether these entities were real property trades or businesses for the purpose of aggregating Dr. Shah's hours spent performing services in real property trades or businesses in order for him to qualify as a real estate professional. A determination that Dr. Shah was a real estate professional would be inconsequential if OCPIN, West Coast, RPS, and DDSYS were not rental activities. In that case, we would examine the entities only to see whether Dr. Shah materially participated in them for the passive activity rules to apply. Furthermore, if any of these entities were not real property trades or businesses, the hours Dr. Shah spent performing personal services for them would count against the Shahs' claim that Dr. Shah qualifies as a real estate professional.

The Code defines a real property trade or business as "any real property development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing, or brokerage trade or business." Sec. 469(c)(7)(C). Mere financing of or investing in real property is not included within the plain language of section 469(c)(7)(C). OCPIN and West Coast acted merely as investment vehicles for IHHI and PCHI, respectively. They

**[*24]** were used presumably as an accessible way for physicians to invest in the hospitals and operations of the hospitals without having to go out and buy and finance these entities themselves. OCPIN and West Coast did not own rental real property, and there is no evidence that they performed any management or operations functions for IHHI or PCHI that could remotely be considered real property trades or businesses. See Aragona Trust v. Commissioner, 142 T.C. 165 (2014). Because OCPIN and West Coast were not engaged in real property businesses, let alone rental activities, section 469(c)(7) does not apply to them and we must examine whether Dr. Shah materially participated in these entities for their losses to qualify as nonpassive. Furthermore, the hours Dr. Shah spent performing personal services for these entities would count against the Shahs' claim that he was a real estate professional.

RPS is a real property business engaged in rental real estate activity. It owned an office building where it leased different suites to businesses including Coastal Heart. The Shahs were property managers for RPS, and they collected rents for the building, prepared the leases, took care of maintenance and repairs throughout the building, and managed the utilities. Because the Shahs performed rental activities, we must use the section 469(c)(7)(B) test to determine whether

[*25] Dr. Shah was a real estate professional to prevent RPS' losses from being characterized as per se passive.

The section 469(c)(7)(B) test specifically compares the taxpayer's personal services in real property trades or businesses he materially participates in with the personal services the taxpayer performs in other trades or businesses in order to determine whether the taxpayer was a real estate professional. Therefore, we need to determine what businesses were real property trades or businesses that Dr. Shah performed personal services for, and if there are any, whether he materially participated in them.

We have already concluded that OCPIN and West Coast were not real property trades or businesses. Therefore, the hours Dr. Shah performed for these entities count towards the hours he spent in his other trades or business. We have also concluded that RPS was a real property trade or business--so the hours Dr. Shah spent performing services for RPS will count towards the hours he spent in real property trades or businesses. That leaves us to determine whether IHHI, PCHI, and DDSYS were real property trades or businesses.

The Shahs failed to create an adequate record to support their position. The record does not reflect any information about DDSYS, so the Court cannot make any conclusive determination about this entity. The record does contain

[*26] information about IHHI and PCHI.  IHHI bought five local hospitals from Tenant for $57 million in 2005.  IHHI was engaged in hospital acquisition and management.  This meets the definition of real property trade or business for purposes of section 469(c)(7)(C).  At trial Dr. Shah testified that after the sale, IHHI split the real estate holding portion of the deal from the hospital operations aspect.  After the division, $50 million of the investment belonged to PCHI and $7 million belonged to IHHI.  PCHI was the owner of the real property after the deal and thereafter leased this property to other hospitals.  Thus PCHI also meets the definition of real property trade or business, and we must examine whether Dr. Shah materially participated in IHHI, PCHI, and RPS.  Only those real property trades or businesses that Dr. Shah materially participated in can be used for purposes of the section 469(c)(7)(B) comparison.

Material participation is defined as involvement in the operations of an activity on a basis which is regular, continuous, and substantial.  Sec. 469(h)(1).  As explained in section 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), a taxpayer can satisfy the material participation requirement if the individual meets any one of the seven regulatory tests:

> (1) The individual participates in the activity for more than 500 hours during such year;

- 27 -

[*27] (2) The individual's participation in the activity for the taxable year constitutes substantially all of the participation in such activity of all individuals (including individuals who are not owners of interests in the activity) for such year;

(3) The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;

(4) The activity is a significant participation activity * * * for the taxable year, and the individual's aggregate participation in all significant participation activities during such year exceeds 500 hours;

(5) The individual materially participated in the activity * * * for any five taxable years (whether or not consecutive) during the ten taxable years that immediately precede the taxable year;

(6) The activity is a personal service activity * * *, and the individual materially participated in the activity for any three taxable years (whether or not consecutive) preceding the taxable year; or

(7) Based on all facts and circumstances * * *, the individual participates in the activity on a regular, continuous, and substantial basis during such year.

"Participation" generally means all work done in an activity by an individual who owns an interest in the activity. Sec. 1.469-5(f)(1), Income Tax Regs. Work done by an individual in the individual's capacity as an investor in an activity is not generally treated as participation in the activity. Id. subpara. (2)(ii)(A), 53 Fed. Reg. 5727. Additionally, work done by the individual is not

[*28] treated as participation in the activity if the work is not of a type that is customarily done by an owner of such activity and one of the principal purposes for performing such work is to avoid the passive activity limitations of section 469. Id. subdiv. (i), 53 Fed. Reg. 5726. In determining whether a taxpayer materially participates, the participation of the spouse of the taxpayer shall be taken into account. Sec. 469(h)(5).

Dr. Shah was the executive chairman of IHHI, and he comanaged both PCHI and RPS. Although he was an investor in IHHI and PCHI, we believe he participated in these entities for purposes of section 469. Assuming that he materially participated in all three of the entities (a determination we are not willing to make at this juncture), we would then have to compare the hours he spent performing personal services for these entities against the hours he spent performing personal services for his other trades or businesses.

With respect to the evidence that may be used to establish hours of participation, section 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), provides:

> The extent of an individual's participation in an activity may be established by any reasonable means. Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means. Reasonable means for purposes of this paragraph may include but are

[*29] not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries.

Dr. Shah did not offer a log, a calendar, or any other writing to prove the amount of time that he spent working at IHHI, PCHI, or RPS. He was duly compensated as executive chairman of IHHI, but he was also duly compensated as a cardiologist for the years at issue. Furthermore, on his tax returns Dr. Shah did not claim to be a real estate professional.

At trial Dr. Shah testified that he spent 14 to 16 hours a day, seven days a week in 2004 on negotiating the purchase of several hospitals. He further testified that he worked over 1,000 hours in 2005 and 2006 negotiating leases for the hospitals, finding investors for PCHI, West Coast, and IHHI, and refinancing loans related to the purchase of the hospitals. Although the regulations permit some flexibility concerning the records to be maintained by taxpayers, the Court is not required to accept a postevent "ballpark guesstimate" or the unverified, undocumented testimony of taxpayers. See, e.g., Moss v. Commissioner, 135 T.C. 365, 369 (2010); Lum v. Commissioner, T.C. Memo. 2012-103; Estate of Stangeland v. Commissioner, T.C. Memo. 2010-185. Dr. Shah's testimony appears to be exaggerated and self-serving. On the basis of that testimony we

[*30] cannot determine with any clarity how many hours Dr. Shah devoted to each entity for which he performed personal services. Dr. Shah did not distinguish the number of hours he spent finding investors for West Coast, a non-real-property trade or business, from the total number of hours he claimed. Furthermore, the Shahs did not describe with any specificity the number of hours they spent performing services for RPS, a legitimate rental real estate trade or business. We decline to accept Dr. Shah's vague testimony regarding the maze of businesses he performed personal services for without adequate documentary support.

The trial record also does not reflect any objective measure of time Dr. Shah spent as a cardiologist during the years at issue. Therefore, the Court cannot compare the hours he spent on personal services in real property businesses--IHHI, PCHI, and RPS--against the hours he spent performing personal services for OCPIN, West Coast, and as a cardiologist.

Dr. Shah therefore does not qualify as a real estate professional under section 469(c)(7), and the rental activities of the Shahs as managers of RPS are per se passive activities under section 469(c)(2) for the years at issue. See sec. 469(c)(4). Furthermore, we cannot conclude that Dr. Shah materially participated in OCPIN, West Coast, and DDSYS (the other entities he claimed losses for on his tax returns for the years 2005-07) because of the lack of corroborating evidence as

[*31] to whether he was involved in the operations of these entities on a regular, continuous, and substantial basis.  Therefore, the loss deductions the Shahs claimed on their tax returns for the years 2005-07 from RPS, OCPIN, West Coast, and DDSYS are passive.

III.    Coastal Heart's Tax Liabilities

The tax issues for Coastal Heart are whether it can report income generated by the CT scanner and claim deductions related to the scanner.

Section 61(a)(2) provides that gross income includes all income from whatever source derived, including gross income derived from business.

Section 162(a) allows a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  A necessary expense is one that is "appropriate and helpful" to the taxpayer's business; ordinary expenses are those that are common or frequent in the type of business in which the taxpayer is engaged.  Deputy v. du Pont, 308 U.S. 488, 495 (1940); Welch v. Helvering, 290 U.S. at 113.

Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that claimed expenses are ordinary and necessary.  Rule 142(a). The taxpayer also bears the burden of substantiating his claimed deductions by keeping and producing records sufficient to enable the Commissioner to determine

[*32] the correct tax liability. Sec. 6001; INDOPCO, Inc. v. Commissioner, 503

U.S. 79, 84 (1992); sec. 1.6001-1(a), (e), Income Tax Regs. The failure to keep

and present such records counts heavily against a taxpayer's attempted proof.

Rogers v. Commissioner, T.C. Memo. 2014-141, at *17. However, if a taxpayer

establishes that deductible expenses were incurred but fails to establish the precise

amounts, we may estimate allowable amounts if there is a rational basis for such

an estimate. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930);

Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

Deductions for depreciation of property used in a trade or business cannot

be claimed by a taxpayer who has no capital investment or economic interest in the

property. Helvering v. F. & R. Lazarus & Co., 308 U.S. 252; Estate of Franklin v.

Commissioner, 544 F.2d 1045, 1049 (9th Cir. 1976), aff'g 64 T.C. 752 (1975).

Generally, a taxpayer's capital investment in the property is the cost of acquiring

the depreciable property. See secs. 167(c), 1011, 1012; Durkin v. Commissioner,

872 F.2d 1271, 1276 (7th Cir. 1989), aff'g 87 T.C. 1329 (1986); sec. 1.1012-1(a),

Income Tax Regs. The taxpayer who is entitled to the depreciation deduction is

the one who suffers the economic loss of his investment by virtue of the wear and

tear or exhaustion of the property--the one who has the economic benefits and

burdens of ownership. Frank Lyon Co. v. United States, 435 U.S. 561 (1978);

[*33] Leahy v. Commissioner, 87 T.C. 56 (1986). Consequently, a stockholder normally is not entitled to depreciate property of his corporation because he lacks a direct economic interest or investment in the property itself. See Hunter v. Commissioner, 46 T.C. 477, 489-490 (1966).

The CT scanner generated income by providing heart scanning services to patients, who in turn paid for these services through their insurers. The CT scanner also had many associated costs. All of the expenses at issue for Coastal Heart relate to the CT scanner. Specifically, Coastal Heart reported expenses related to the scanner for: (1) lease payments; (2) the salaries of technicians who operated it; (3) repairs and maintenance; (4) rent for the portion of Coastal Heart's office that accommodated it; and (5) depreciation of office furniture in the area that accommodated it. Respondent argues that the income and expenses should be allocated to Coastal Imaging because it managed the scanner. The Shahs argue that Coastal Heart should be allowed to deduct the expenses because it paid them. To illustrate the confusion surrounding the issue, Coastal Heart--the constructive owner of the scanner--was deducting rental payments made on the scanner while Coastal Imaging--the mere managing entity of the scanner--was deducting depreciation for the scanner.

[*34] A payment for the use or possession of business property is deductible as rent only if made for property to which the taxpayer does not take title or in which he has no equity. Sec. 162(a)(3). In other words, payments are not deductible as rent when they are actually part of the purchase price of the property--i.e., constitute a conditional purchase. See Calbom v. Commissioner, T.C. Memo. 1981-95.

As discussed earlier, the lease of the CT scanner between Siemens and Coastal Heart was a conditional purchase of the scanner by Coastal Heart. Therefore, Coastal Heart should have capitalized the rental payments on the lease. Since Coastal Heart was the constructive owner of the scanner and the scanner was not contributed to Coastal Imaging, Coastal Heart was entitled to depreciation deductions on the scanner--not Coastal Imaging.

Although the CT scanner was not contributed to Coastal Imaging, its business purpose was to manage the scanner. The Shahs asserted that Coastal Imaging managed the scanner and Dr. Shah separated the income between Coastal Heart and Coastal Imaging for this purpose. Therefore, the gross income derived from the scanner should have been reported by Coastal Imaging, not Coastal Heart. See sec. 61(a)(2).

**[*35]** Similarly, Coastal Heart did not meet its burden of showing that the expenses it claimed relating to the CT scanner were ordinary and necessary to its business. Although the scanner was located in a portion of Coastal Heart's office, Coastal Heart expanded its office primarily to accommodate the scanner and run the business of Coastal Imaging. Coastal Heart has not met its burden of proving the claimed expenses were ordinary and necessary to its business. Accordingly, we sustain respondent's determinations with respect to this issue.

IV.    Section 6662(a) Penalties Determined Against the Shahs and Coastal Heart

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax which is attributable to, among other things, a substantial understatement of income tax. An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). In the case of a corporation (other than an S corporation or a personal holding company), an understatement of income tax is substantial if it exceeds the lesser of 10% of the tax required to be shown on the return (or, if greater, $10,000) or $10 million. Sec. 6662(d)(1)(B).

The Commissioner bears the burden of production with regard to the Shahs' penalty and must come forward with sufficient evidence indicating that it is appropriate to impose the penalty. See sec. 7491(c); Higbee v. Commissioner, 116

**[\*36]** T.C. 438, 446-447 (2001). Coastal Heart, as a corporation, bears the burden of proving that it is not liable for accuracy-related penalties pursuant to section 6662(a). See NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006). If the understatements of income tax for the years at issue are substantial, respondent has satisfied the burden of producing evidence that the penalties are appropriate.

With respect to the Shahs, respondent's deficiency determination for tax year 2007 exceeds 10% of the tax required to be shown on their joint return for this year, which is greater than $5,000. Thus respondent's burden of going forward has been satisfied with respect to them. With respect to Coastal Heart, respondent's deficiency determinations for tax years 2004, 2005, 2006, and 2008 exceed $10,000, which is greater than 10% of the tax required to be shown on its returns for these taxable years. Respondent's deficiency determination for tax year 2007 exceeds 10% of the tax required to be shown on its return, which is greater than $10,000. Therefore, Coastal Heart's understatements for the years at issue were substantial.

Once the Commissioner has met the burden of production, the taxpayer must come forward with persuasive evidence that the penalty is inappropriate because, for example, the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448-449. The decision as

[*37] to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on the advice of a tax professional may, but does not necessarily, establish reasonable cause and good faith for the purpose of avoiding a section 6662(a) penalty. United States v. Boyle, 469 U.S. 241, 251 (1985) ("Reliance by a lay person on a lawyer [or accountant] is of course common; but that reliance cannot function as a substitute for compliance with an unambiguous statute."). The caselaw sets forth the following three requirements in order for a taxpayer to use reliance on a tax professional to avoid liability for a section 6662(a) penalty: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 n.8 (9th Cir. 2005) (quoting with approval the above three-prong test), aff'g 121 T.C. 89 (2003). In addition, the advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations,

**[*38]** statements, findings, or agreements of the taxpayer or any other person.  Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.

The fact that petitioners had an accountant prepare their returns does not, in and of itself, prove that they acted with reasonable cause and in good faith.  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99-100.  Dr. Shah's failure to properly document his time spent performing personal services for real property trades or businesses was detrimental to his ultimate effort to substantiate all of the time he spent on his real property trades or businesses.  See sec. 6001; sec. 1.6001-1, Income Tax Regs.  This made it impossible for his accountant to have all the accurate information necessary to make an informed tax decision.  The accountant relied on the Shahs for an accurate representation of the number of hours Dr. Shah worked on his real property trades or businesses; however, the Shahs were unable to provide a reasonable estimate of the number of hours Dr. Shah performed services for each of the entities he was managing.  Some of these entities were real property trades or business and some were not, and Dr. Shah failed to make that distinction.  Therefore, the Shahs have not proven reasonable cause for their underpayment and they are liable for the section 6662 accuracy-related penalty for tax year 2007.

**[\*39]** With respect to Coastal Heart, we are unpersuaded that Dr. Shah, as the sole shareholder of Coastal Heart, reasonably relied on the correctness of the contents of its returns simply because they were prepared by a certified public accountant. The mere fact that the certified public accountant prepared its tax returns does not mean that the accountant commented on any or all of the items reported therein. In this regard, the record contains no evidence that Dr. Shah asked the accountant to comment on the legitimacy of his treatment of the allocation of expenses between Coastal Imaging and Coastal Heart--especially when the managing entity, Coastal Imaging, claimed depreciation deductions on the CT scanner and the constructive owner, Coastal Heart, claimed deductions for rental payments for the scanner. Dr. Shah separated the income of Coastal Imaging and Coastal Heart, and he should have had a clear, or at least basic, understanding of how each entity functioned in relation to the other. The record and Dr. Shah's testimony do not reflect that this is the case. Therefore, we conclude that Coastal Heart is liable for the accuracy-related penalties that respondent determined.

We have considered all the other arguments made by the parties, and to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

**[*40]** To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.